218 So.2d 230 (1969)
HAYDEN, STONE INCORPORATED and Robert D. Bowen, Appellants,
v.
Robert L. BROWN, Appellee.
No. 1155.
District Court of Appeal of Florida. Fourth District.
January 14, 1969.
Rehearing Denied February 21, 1969.
*231 Cromwell A. Anderson of Smathers & Thompson, Miami, for appellants.
H.J. Frazier, of Patterson, Maloney & Frazier, Fort Lauderdale, for appellee.
OWEN, Judge.
Appellants are a stock brokerage firm and its registered representative. Appellee Brown, plaintiff below, was a customer of appellants and sought to recover damages for the alleged improper handling of his account. Although the amended complaint was in five counts, we are concerned only with COUNT II, alleging that Bowen, while in the course and scope of his employment on behalf of the brokerage firm, wrongfully engaged the account in excessive trading in volatile and speculative securities, and COUNT III, alleging that Bowen improperly placed an order to purchase certain securities known as Salem-Brosius. The case was tried before the court without a jury resulting in the court finding in favor of appellee, determining his damages under COUNT II to be the sum of $22,825.78, and his damages under COUNT III to be the sum of $33,818.42, and awarding judgment against the defendants jointly and severally for the total sum of $56,644.20.
There were conflicts in the testimony on many matters, but the essential facts are set forth most favorably to the appellee (with one exception which is expressly noted and explained in footnotes). Appellee Brown was a 47-year old college graduate with no dependents. He had been successfully engaged in various business enterprises and at the time he met appellant Bowen, had just completed constructing a cooperative apartment. Bowen had rented one of Brown's apartments following which they had met socially. At that time Bowen was a registered representative of Hayden, Stone Incorporated, and although he had limited experience in the stock market, he held himself out to the plaintiff as a competent, qualified stock broker. Brown, who had no prior experience in the stock market, became interested in Bowen's business and asked Bowen for his impression of stocks which Brown had inherited from his mother and which had a value of approximately $12,000.00. These securities consisted of stock in utilities, insurance companies and banks, yielding approximately 2 or 3% annual dividends. Bowen was unenthusiastic about these stocks, but spoke very enthusiastically about other stocks which he thought were "going up" and which would yield Brown a much better return. Bowen thereupon convinced Brown to open a trading account with Hayden, Stone Incorporated.
Bowen made a limited inquiry as to appellee's financial resources, investment requirements and objectives. He ascertained that Brown's net worth was approximately $100,000.00, of which the inherited stocks and approximately $30,000.00 in cash were available for placing in the account, and that *232 Brown wanted to earn approximately 10% return on his money and at the same time keep the funds as liquid as possible in anticipation of starting another cooperative apartment building. Although Brown was inexperienced in the stock market, he understood that his expectations of making a return at such a rate would be accomplished through active trading in the account rather than through expectation of dividends or long-term appreciation.
The account was opened as a cash account in May, 1963, and certain securities purchased on the recommendation of Bowen. In approximately one month a portion of these securities were sold at a loss of a few hundred dollars and on the recommendation of Bowen other securities were purchased. Thereafter Bowen made more recommendations and more stock was purchased and sold shortly thereafter. Brown placed with Hayden, Stone the stock which he had inherited. It was sold, the proceeds placed in his account upon the recommendation of Bowen, and the account changed to a margin account. From that time on the transactions in the account became increasingly more frequent, with most of the transactions being reversed within a period of one month and many within a matter of a day or two. Although Brown's maximum cash invested at any one time was $35,000.00, there was one day when the transactions in the account were in excess of $165,000.00. Up to the time of the Salem-Brosius transaction in October, 1964, there were nine separate occasions when a single purchase of securities was in excess of $35,000.00. Nearly all of the securities involved in the transactions were considered speculative or volatile stocks and some of the transactions involved day trading in such. Brown traded in volatile stocks with the intent of selling as soon as he could do so at a profit. When Hayden, Stone ceased trading one such stock because it was too volatile, Bowen arranged for Brown to continue trading in such stock with Walston & Co., [through which firm Brown lost approximately $9,000.00]. Although nearly all of the transactions in the account were made on the recommendation of Bowen, no transaction was made without the approval of Brown. Sometimes Brown rejected Bowen's recommendations and toward the last Brown solicited the advice of others employed in the office. During the eighteen months up to the fateful day of the Salem-Brosius transaction, there was a total of 335 transactions in the account (exclusive of 26 transactions made by Bowen for his own purposes) involving purchases and sales in an aggregate amount in excess of $3,000,000.00. On these transactions appellants earned $22,898.05 in commission.
Brown received the customary confirmation slips on each transaction and received monthly statements of his account from Hayden, Stone Incorporated. These confirmation slips and monthly statements accurately set forth the complete details of the transactions, together with the amount of commission charged on each transaction. At no time did Brown ever make known any objection to the size or frequency of the transactions, or to the commissions being charged by the appellants. As his account became more and more active, Brown spent more and more of his time in the firm's office watching the reported activities of the stock market. Although Brown appeared to grasp the terminology of the market, he continued to repose complete trust and confidence in Bowen and to rely almost entirely on his recommendations, suggestions and advice concerning the type of stock to purchase, the amount to purchase and the time and price at which to sell. For approximately 18 months this arrangement continued blithely along with no apparent dissatisfaction on the part of Brown. During this time there was a lack of supervision or reasonable inquiry into the account on the part of any of Bowen's superiors.
The catastrophic effects of the Salem-Brosius transaction abruptly shattered what was apparently a satisfactory arrangement to all concerned. On Friday, October 9, 1964, some rather violent activity was observed *233 in Salem-Brosius and Brown attempted to purchase 500 shares but the market closed before the transaction could be made. At that time the stock was trading at approximately 6 and there were indications that it would open substantially higher the following Monday and Brown anticipated that its momentum would carry it up several points thereafter. Contemplating the matter over the weekend, Brown decided to place an order for 5,000 shares at 10 1/4 when the market opened on Monday, October 12, 1964. He did place the order with Bowen the first thing Monday morning. The stock did not open at the regularly scheduled time and prior to the opening, announcements were made which stated that the stock would open at a price higher than 10 1/4. Brown, realizing that he would not get the stock on the basis of his earlier order, entered an order to purchase 5,000 shares "at the market". The market on Salem-Brosius opened at 11 3/8 at which time his order of 5,000 shares "at the market" was executed. Shortly after opening the stock fell, and when it reached 10 1/4 Brown's earlier order for 5,000 shares at that price was also executed. Brown insisted that he had placed the order for 5,000 shares at 10 1/4 "on the opening" which under the custom of the trade would have required automatic cancellation of the order when the stock opened at a higher price. Bowen testified that the order for 5,000 shares at 10 1/4 had not been restricted in such manner, and that Brown had actually wanted a total of 10,000 shares; that Bowen had tried to dissuade him from purchasing this much since it involved a purchase in excess of Brown's ability to pay; and that he ultimately obtained Brown's approval to cancel the order at 10 1/4 but the cancellation went in too late. After the market opened on that day and Brown was aware that his order of 5,000 shares "at the market" had been executed at 11 3/8, he placed an order to sell in lots of 1,000 shares beginning at 12 5/8 and staggered upward in fractional increases. Neither on the day in question nor at any time thereafter did the stock ever reach 12 5/8. Shortly before the market closed on the day in question Brown became aware of the fact that 10,000 shares had been purchased for his account, concerning which he testified as follows:
"Q All right.
"Approximately what time in the afternoon do you believe that you were the owner of 10,000 shares?
"A That was very late in the afternoon. That is late in the trading time. It was just prior to the close. Now, that might have been a half hour or it might have been an hour before the close of the market for that day.
"Q All right.
"Now, did you have any discussion when you at least believed you had 10,000 shares with Mr. Bowen?
"A Yes. Mr. Bowen was as upset as I was about that. And we tried to find out why I got 10,000 shares instead of 5,000 shares. I think he sent wires or something back, trying to find out.
"When it became apparent that it was registered to me rather than just 5,000 shares, the 10,000 shares, and as I say, this was about an hour or so, at that time the only thing we could do was to sell 5,000 shares. So he put an order in at the end to sell 5,000 shares of Salem-Brosius, leaving us 5,000.
"Q On this date, how much cash did you have or how much liquid assets did you have on this Monday, October 12th?
"A I had enough to cover the 5,000 shares, which would be about $35,000.00."
The 5,000 shares which had been purchased at 10 1/4 (for a total cost of $51,607.50) was sold that same day at the close of the market at a price of approximately 9 (producing a net return to Mr. Brown's account of $45,998.26). The loss sustained that day on the 5,000 shares which had been purchased on the 10 1/4 order was the sum of $5,609.24. Unfortunately, Salem-Brosius continued to decline thereafter and approximately *234 four days later appellant Hayden, Stone made a margin call to Brown for approximately $26,000.00 which Brown paid. For two or three weeks thereafter Brown paid daily visits to the brokerage office to check on the price of Salem-Brosius hoping that it might recover to around 12 so that he could sell and break even but instead the price continued to decline. Several weeks later Mr. Brown asked Hayden, Stone's branch manager for an explanation of the computation of his margin call, and when he felt that the explanation was insufficient, he walked out of appellant's office never to return. In the early part of December, 1964, Hayden, Stone sold 1,000 shares of the Salem-Brosius for $5,971.13 and after January 1, 1965, sold the remaining 4,000 shares. Those funds were accounted for to Brown and are not involved in this litigation.
Plaintiff's accountant submitted in evidence a detailed itemization of each transaction in the account showing the date of the transaction, the amount paid or the amount received as the case might be, and the commissions collected by the appellants. The accountant also submitted in evidence a summary sheet showing that after giving credit for a small gain made on the 1963 transactions, and a credit for the amount repaid to the account by Bowen for his personal transactions, there was an overall trading loss including Walston & Co. transactions, from which the trial court computed such loss in the account to be the sum of $22,825.78[1] up to the Salem-Brosius transaction. The accountant's summarization also showed that as of the close of 1964 the 4,000 shares of Salem-Brosius which still had not been sold had an unrecovered cost of $41,437.50.[2] The evidence established that these 4,000 shares were later sold by Hayden, Stone for $7,619.08 which amount was paid over to appellee.
Based on this evidence the court determined that appellants were guilty of negligence in handling plaintiff's financial affairs up to the Salem-Brosius transaction resulting in losses in the amount of $22,825.78, and that appellants were guilty of negligence in the handling of the Salem-Brosius transaction resulting in a further loss in the amount of $33,818.42, whereupon the court entered judgment against the appellants jointly and severally for the aggregate sum of $56,644.20.
Turning first to the dispute on the Salem-Brosius transaction, it appears to us that this is simply a question of fact as to whether Brown intended to purchase 5,000 shares only, or whether he actually intended to order 10,000 shares. The trial court resolved this factual issue in favor of appellee, finding in effect that the 5,000 shares purchased for the account at 10 1/4 was an error on the part of the appellants. However, the trial Court erred in determining the amount of damages sustained by appellee on this transaction as a result of appellants' negligence.
Accepting entirely the appellee's version of what transpired, it is clear that he wanted 5,000 shares and when he realized he could not purchase these at 10 1/4, he authorized Mr. Bowen to purchase them "at the market". Appellee was aware that the market opened at 11 3/8 and that he acquired *235 5,000 shares at that time and at that price. He placed an order to sell those 5,000 shares in lots of 1,000 shares each and while he did not remember the exact figures at which he had ordered these sold, he agreed that it was as shown by the appellants' records which showed sell orders in lots of 1,000 each beginning at 12 5/8 and moving upward in fractional increments. Appellee was aware that the market never reached any of these figures. When appellee learned that day that 10,000 shares had been purchased for his account, he ordered 5,000 shares sold "at the close" which was done, leaving him 5,000 shares of which he was well aware. The 5,000 shares which the trial court found to have been erroneously purchased for his account on that day, were sold the same day resulting in a net loss to appellee's account in the amount of $5,609.24.
The record shows without dispute that appellee's purchase of 5,000 shares of Salem-Brosius made on Monday, October 12, 1964, at 11 3/8 was entirely his own selection and appellee does not contend that this was due to any recommendation on the part of Bowen. When the appellants rectified the erroneous purchase of the additional 5,000 shares by selling the same at the close of the market on that day, appellants' liability for this particular transaction terminated. The subsequent decline in the value of Salem-Brosius was a loss which must fall solely on appellee whose own judgment was responsible for the selection and purchase of the stock on that date and whose judgment was responsible for continuing to hold the 5,000 shares after that date in anticipation of a rise in value. The damages awarded appellee for loss due to negligence in the handling of this transaction should have been the sum of $5,609.24 instead of the sum of $33,818.42.
As to the remainder of the judgment, we find no substantial evidence in the record to support a finding of negligence on the part of the appellants in their handling of appellee's financial affairs prior to the Salem-Brosius transaction which proximately resulted in any loss to appellee, and accordingly the trial court was in error in awarding appellee any damages under COUNT II.
The law charges the stock broker with utmost honesty and good faith in his transactions.[3] The evidence does not establish that the appellants failed to meet this standard, as there was no evidence of fraud, misrepresentation or absence of good faith.
Appellee argues that the evidence establishes that appellants were guilty of "churning", that is, engaging the account in transactions which are excessive in size and frequency in view of the financial resources and character of the account. Churning has been held to be a "manipulalative or deceptive device or contrivance" contrary to Section 10(b) of the Exchange Act of 1934 (15 U.S.C.A. § 78a et seq.) and Rule 10b-5 promulgated thereunder.[4] Engaging an account in excessive trading for the purpose of producing commissions rather than acting on behalf of one's client is a practice which is deserving of the severest condemnation, and its very nature brands it as one of the most injurious types of fraud possible.[5] But in the case at bar the account was non-discretionary and *236 every single transaction was first approved by Brown.[6] To the extent that there were transactions which might be classified as "excessive" in size or frequency in a discretionary investment account such classification could not reasonably be applied here. Initially the transactions were relatively few in number and small in size. The increase in size and frequency of the transactions occurred after Brown commenced his almost daily attendance at appellant's offices, where he closely followed the market activity in various stocks. He expected to make short term trading profits through the device of keeping close observation on market fluctuations and buying and selling as it appeared advantageous to do so. The very nature of his modus operandi required large and frequent transactions. While he did rely on Bowen for recommendations on these transactions, as frequently as not such recommendations were made at the request of Brown. There was no evidence that Bowen was encouraging the transactions primarily for the purpose of creating commissions nor any evidence that Bowen was not acting in good faith. Most recommendations made by Bowen were on the basis of information furnished by the company's office or on the basis of his "charting" the stocks' past performances, and Brown was of sufficient intelligence to know that such recommendations were not the equivalent of guarantees.
Appellee contends that Bowen was negligent in recommending speculative and volatile stocks and that Hayden, Stone was negligent in not supervising the account more closely. Aside from the fact that neither of these alleged acts of negligence was the proximate cause of any loss sustained by appellee, trading in this type of stock was entirely consistent with Brown's expressed objective of a higher return on his money. He was fully aware of the volatile and speculative nature of the stocks in which he was dealing and apparently perferred to trade in this type of stock because of the greater and more rapid fluctuation. That he preferred large transactions in volatile stocks is made clear by his avid desire to purchase 5,000 shares of Salem-Brosius at 10 1/4 [which one transaction would have exhausted all of his purchasing power], a decision made entirely on his own both as to the stock and the size of the transaction.
There is certainly no evidence in the record that any of the transactions were misrepresented to appellee by the appellants. On the contrary, each transaction was confirmed in the regular course of business by means of written confirmation slips furnished to appellee showing full details of the transaction including the amount of appellant's commission. Likewise, appellee received monthly statements showing the status of his account. No matter how unsophisticated Brown may have been insofar as prior experience in the stock market, his age, education, intelligence and past business experience generally showed him to have business acumen.[7] The written confirmation slips and the monthly statements furnished appellee were such as could be readily understood by a person of Brown's educational and business background. He knew commissions were being charged on each transaction and the amount of such commissions. He knew that the account was engaged in frequent transactions. He was well aware of the fact that many of the transactions were sizeable in proportion to his ability to pay. He knew that the market could fluctuate either up or down, and he knew that some transactions resulted in gains and some resulted in losses. With this knowledge, and hence with a reasonable awareness of what was going on, he did not at any time [until after the Salem-Brosius transaction] ever make known any objection to the manner in which his financial affairs were being handled by appellants.
*237 Carr v. Warner[8] involved a suit by a customer against a stock broker and its representative, alleging among other things, that the defendants had "churned" her account after plaintiff had opened the account and invested her funds in reliance upon the defendants to act in her best interest. Plaintiff was a housewife, a high school graduate with some work experience in a bank, her husband was an accountant and the securities salesman was a friend and neighbor. As each transaction occurred plaintiff was furnished with the usual confirmation in writing giving details of the transaction. In addition, she received at the end of each month a monthly statement of the account setting forth every transaction during the preceding month. Plaintiff never asked for any further information with respect to such transactions. The majority of the transactions were specifically authorized by the plaintiff prior to their consummation but in approximately one-third of the transactions the salesman executed the same without her prior approval, although he did consult her and obtain her subsequent approval or acquiescence in every case. The commissions charged were in line with those prevailing in the trade and there was no evidence that the defendants ever made any false representations with respect to any of the securities bought or sold in the account. The court held that under these facts the plaintiff had no cause of action, stating as follows:
"Upon the basis of the foregoing findings of fact, there is no evidence of any breach of duty either at common law or under any statute on the part of J. Arthur Warner, individually, or J. Arthur Warner & Co., Inc. Neither of them knew, or could have known of, a discretionary power granted by the plaintiff. Thayer in his capacity as salesman for the partnership and the corporation made no representations which were shown to be false or which were relied upon to the detriment of the plaintiff. Neither the partnership nor the corporation having made any unreasonable nor unusual profit in handling the plaintiff's account, neither of them failed in any duty imposed upon them as brokers, fiduciaries, principals, or otherwise. Even if there had been a breach of duty, which there was not, plaintiff by repeatedly accepting confirmations and accounts, which fully disclosed all aspects of the transactions, elected not to rely upon that breach. Moreover, by failing seasonably to make complaints of facts of which she was informed, she would in any event be barred from her late assertion of wrong done unto her by the partnership or corporation.
"So far as concerns Thayer, the Court does not believe that he made any misrepresentation of fact or of opinion, or otherwise, as to the quality of any security or the nature of any security transaction. If any representation were made, the Court does not believe that the plaintiff in view of her experience, education, and constant inspection of accounts relied upon that representation. In so far as there is some complaint that Thayer exercised a discretionary power to engage in excessive number of transactions for the account of the plaintiff, the Court, without deciding whether as a result of statute, regulation, or common law, there is a duty upon a salesman acting solely at the request of a customer (and without the knowledge of the salesman's normal employer) to refrain from excessive transactions, nonetheless determines that upon the basis of the evidence in this case, the plaintiff cannot recover on that theory of churning. Plaintiff was fully apprised of the number and frequency of the transactions. She was fully competent to exercise a judgment as to whether such a large number of transactions were in her interest. She not only refrained from protesting, she in fact by repeated silences under the most *238 frequent reminders in writing as to the state of her accounts, fully acquiesced in what Thayer had done for her."
In a related action, Nash v. J. Arthur Warner & Co.[9] with somewhat similar facts involving customers who had background as successful businessmen, the court stated that on the basis of the facts, the plaintiffs were far from being lured by some salesman, but rather by their roseate expectations.
The judgment for the appellee is reduced from $56,644.20 to the sum of $5,609.24, and as thus modified the judgment is affirmed.
REED, J., and DYKES, ROGER F., Associate Judge, concur.
NOTES
[1] Based on the accountant's summary this figure should have been $22,925.78. This is not significant. The real error occurs in the accountant's determination of the amount of "1964 completed transactions" losses through Hayden, Stone. He arrived at this figure by erroneously using as unrecovered costs of 4,000 shares of Salem-Brosius the sum of $41,437.50. Had he used the correct figure as explained in note 2 infra, his summary would have disclosed that the overall transactions through Hayden, Stone [up to the Salem-Brosius transaction] actualy resulted in a gain of $2,043.61.
[2] The 10,000 shares of Salem-Brosius cost $109,401.50, and the total received for 6,000 shares sold was $51,969.39, leaving as unrecovered costs of the remaining 4,000 shares the sum of $57,432.11. While plaintiff's overall losses are not diminished, the loss on the Salem-Brosius transaction was actually $15,994.61 greater than shown by the summary and the trading losses incurred prior to that time were actually that much less.
[3] Henderson v. Usher, 1936, 125 Fla. 709, 170 So. 846.
[4] Lorenz v. Watson, E.D.Pa. 1966, 258 F. Supp. 724.
[5] Ibid. The appendix to appellee's brief contains the complete report of four cases before the Securities and Exchange Commission in which churning was held to be a violation of the fiduciary duty which the stockbrokers owed to the customer, as well as a violation of the Securities Exchange Act and rules thereunder, and such violation justified revocation of registration of the broker-dealer. These cases are distinguishable as they generally involved customers who were elderly with no business experience, whose accounts were intended primarily for investment rather than trading accounts, and were discretionary accounts.
[6] It is clear that Brown's consent was both a voluntary and a fully informed consent. Cf. Norris & Hirschberg, Inc., 21 S.E.C. 865 (1946).
[7] Cf. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bocock, S.D.Tex. 1965, 247 F. Supp. 373.
[8] D.Mass. 1955, 137 F. Supp. 611.
[9] D.Mass. 1955, 137 F. Supp. 615.