No. 56,667

EF Hutton & Company, Inc., A Corporation, *Appellant*, v. Gerald Heim, *Appellee.*

(694 P.2d 445)

Opinion filed January 26, 1985.

*Laurence A. Taylor,* of Shalz, Taylor, Schiffner & Kriss, of Colby, argued the cause and *Joel R. Kriss,* of the same firm, was with him on the brief for appellant.

*John R. Eland,* of Sloan & Eland, of Hoxie, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

Holmes, J.: EF Hutton & Company, Inc. (Hutton) appeals from a judgment entered upon a jury verdict in favor of the defendant and counterclaimant Gerald Heim. The trial court granted plaintiff summary judgment for $46,310.76 on its petition to recover on a promissory note executed by the defendant. Gerald Heim had admitted liability on the note but counterclaimed seeking damages for Hutton's alleged negligence in erroneously reporting a commodity futures transaction on the Chicago Board of Trade (CBOT). The jury found for Heim on his counterclaim, awarded damages of $193,300.00 and assessed the fault or negligence 15% to Heim and 85% to Hutton. The trial court entered judgment upon the verdict for $164,305.00 and Hutton has appealed.

The facts are complicated and will be set forth in some detail. Heim, a private investor, with approximately fifteen years' experience trading in various commodities futures, opened a trading account with Hutton on April 19, 1980. Heim designated Sam

Atkins of Goetz Advisory Service (Goetz), a solicitor for Hutton of commodity orders in and around Park, Kansas, to handle orders for Heim's account. When Heim desired to place a buy or sell order he would contact Sam Atkins with Goetz and give him directions. Goetz then telephoned the order to Hutton's Kansas City office. The order was then relayed to Hutton in Chicago where a broker on the floor of the CBOT was contacted and given the order. When the floor broker had filled the order the notification process was reversed: floor broker to Hutton in Chicago, to Hutton in Kansas City, to Goetz in Park, Kansas, to Heim. The floor broker was not an employee of Hutton.

Although Heim began trading with Hutton in commodities futures shortly after opening the account, the transactions leading to this appeal did not occur until the latter part of September, 1980. On September 22, Heim purchased contracts for 50,000 bushels of November soybeans at a price of $8.745 per bushel. Two days later, another 50,000 bushels of November soybeans were purchased at a price of $8.65 per bushel, and on September 26, a final 50,000 bushels were purchased at $8.30 per bushel. These contracts were purchased on margin, requiring Heim to put up only a small fraction of the actual cost. The transactions were reflected in his account with Hutton. Holding these "buy contracts," Heim was in a "long position" on the November soybeans, standing to profit if the market price rose above his acquisition price and standing to lose money if the market price fell.

The market, as so often happens, did not cooperate and the price of November soybeans fell throughout the remainder of September. Faced with this declining market and the corresponding loss on his November soybeans, Heim entered into a "spread," or a "straddle," in an attempt to mitigate his potential losses. A spread is an offsetting position designed to theoretically eliminate a trader's risk during periods of uncertain market behavior. In this case, a proper spread required that Heim, holding buy contracts in a long position, sell additional soybean contracts short so that hopefully the loss sustained on one position as a result of market movement would be offset by a corresponding gain on the other position.

Heim called Sam Atkins at Goetz at approximately 12:15 p.m. on September 29, and told him he wanted to sell contracts for

150,000 bushels of May soybeans. Ten minutes later Atkins called back and confirmed the sale at a price of $8.52 per bushel. A few minutes later, Heim again called Atkins and asked him to confirm the sale price on the May soybeans. In about ten minutes Atkins called Heim and advised "EF Hutton ha[s] confirmed the fill at $8.52." During these calls Heim was watching a market quote screen in his home, and he observed the price of May soybeans reach a low of $8.42. Upon receiving verification of his sale at $8.52, Heim watched the market price begin to rise from its low of $8.42, and decided to buy at around $8.48 and take his profit on the short position. About 1:00 p.m. he called Atkins and placed a buy order for 150,000 bushels of May soybeans. Unfortunately, by the time the order was executed the price had risen above the $8.52 per bushel selling price originally quoted to Heim. Contracts for 50,000 bushels of May soybeans were purchased on Heim's behalf at $8.66 per bushel, and 100,000 bushels were purchased at $8.68 thereby offsetting his May sell contract but resulting in a substantial loss on the May soybean transactions.

As these transactions were represented to Heim, he believed he had first sold contracts for 150,000 bushels of May soybeans at a price of $8.52 per bushel, for a total of $1,278,000.00. The later buy contracts for 150,000 bushels of soybeans cost him $1,301,000.00. Having sold short in a rising market, it appeared Heim had lost $23,000.00. At the same time the November soybean market was falling and as a result he was also losing on his long position in that market.

The actual loss, however, was greater. On the following day, September 30, 1980, Sam Atkins contacted Heim and advised that Hutton had called earlier that morning to "correct" the sale price of the May soybeans, previously quoted and confirmed at $8.52 per bushel, to $8.42. Contrary to Hutton's representations on September 29, Heim's sell contracts for 150,000 bushels of beans at $8.42 per bushel netted him only $1,263,000.00. His buy contracts at a cost of $1,301,000.00 left Heim with an actual loss of $38,000.00 for the previous day on the May transactions. Heim testified that had he known the actual price received on his sell contracts was $8.42 per bushel he would not have terminated his short position on September 29, presumably because the market never fell below that price. He also testified that on October 3,

1980, four days after these transactions, the low price recorded for May beans was $8.475 and had he waited to terminate his short position until that point, his loss would have been only $8,250.00, as opposed to $38,000.00. This, of course, presumes that he would have made the decision to sell at $8.475 rather than wait for the price to go even lower. As with many things, hindsight is always better than foresight when trading in the commodities market.

The $38,000.00 loss sustained on the September 29 transactions when deducted from Heim's account with Hutton, resulted in an insufficient margin to maintain Heim's long position on the November soybeans. The "maintenance margin" is the amount of money required to be in a trading account in order to keep a contract, and a "margin call" is a request to the trader for payment of cash into the account in the amount necessary to meet the required margin. On September 30, the same day Hutton informed Heim of the corrected sale price, the company also issued a margin call in the amount of "$40 or $45,000" to restore the maintenance margin in Heim's account. It appears he was dealing in a number of futures contracts at the time and Heim was unable to meet this margin call.

On October 2, 1980, Heim spoke on the telephone with Harold Saunders, Hutton's regional sales manager in Kansas City, and Saunders told Heim to either place the required margin money in his account or liquidate his long position on the November soybeans. When asked what Hutton intended to do about the erroneous price quotation, Saunders replied "he was sorry, that they had made the mistake, but they weren't going to do anything about it." Unable to meet the margin call, and knowing Hutton could liquidate the account if he didn't, Heim advised Sam Atkins to sell the November soybean contracts. 50,000 bushels were sold at $7.92 per bushel, and 100,000 bushels were sold at $7.91, resulting in additional losses on the November soybean contracts.

Following Heim's voluntary liquidation of his account on October 2, 1980, there began a flurry of correspondence between the parties. Hutton was seeking payment of the amount owed while Heim was seeking more information as to why there had been an error in reporting the May soybean sales. Hutton maintained that while it was unfortunate that the error occurred it was

not liable under the CBOT rules and regulations by which both parties were bound. In support of its position, Hutton sent Heim a copy of Regulation 331.01 which reads:

"331.01 Price of Execution Binding—The price at which an order for commodites is executed on the Exchange shall be binding notwithstanding the fact that an erroneous report in respect thereto may have been rendered. A member shall not assume or pay any part of the difference between the price at which an order is executed and the price at which it may have been erroneously reported or make any adjustment with his customer because of an error in handling an order *except as outlined in Regulation 350.04.*" (Emphasis added.)

A copy of Regulation 350.04 did not accompany the letter, nor was there any explanation of its contents. Relying on the regulation and numerous letters from Hutton, Heim executed on April 15, 1981, a promissory note due August 1, 1981 for $40,623.48, the amount allegedly owed on the margin account, together with interest at 10% per annum. When Heim was unable to pay the note Hutton filed suit and Heim counterclaimed for damages resulting from Hutton's negligence in furnishing incorrect information about the May soybean transaction. He also admitted his obligation on the promissory note.

It was not until the discovery stage in the proceedings below that Heim actually received a copy of CBOT Regulation 350.04, which states:

"Errors and Mishandling of Orders—*A Commission house becomes an agent for a customer in accepting an order and a floor broker becomes an agent upon accepting an order. Any loss resulting from an error or mishandling of an order for a customer must be borne by the commission house and/or the broker depending upon who made the error.* Any profits resulting from the error or mishandling of an order belong to the customer. However, if the customer is fully informed and agrees to accept the agent's guaranty of no loss to him from the error or mishandling, then the subsequent acts of the agent to limit or recoup any loss are for the account of the agent and not for the account of the customer." (Emphasis added.)

Prior to receiving a copy of this regulation in September, 1983, defendant Heim understood Regulation 331.01 placed on him, alone, the entire risk of any loss resulting from errors of Hutton and/or the floor brokers at the CBOT. With the foregoing facts and background we now turn to the various issues on appeal.

Hutton's first claim on appeal is that defendant Heim is bound by the regulations of the CBOT and that those regulations were disregarded by the trial court and the jury in awarding damages

to Heim. There is no dispute the parties were bound by the CBOT regulations. Heim agreed to be bound by them when he signed his "Customer's Agreement" with Hutton at the time of opening his trading account.

Where a customer of a commodity broker signs an agreement in which he acknowledges that the transactions will be governed by the rules and regulations of the commodity exchange, those rules and regulations may properly be admitted into evidence in the customer's suit against the brokerage firm. *Meunier v. Conti Commodity Services*, 374 So.2d 193 (La. App. 1979); see also Meyer, The Law of Stock Brokers and Stock Exchanges, Sec. 26 (1931); and 12 Am. Jur. 2d Brokers Sec. 119. The regulations involved here were admitted into evidence, and the trial court instructed the jury that "[a]ll parties in any way involved in commodity trading on the Chicago Board of Trade are bound by all rules and regulations of the Chicago Board of Trade."

The thrust of plaintiff's argument is that because defendant Heim is bound by the CBOT regulations he is barred from recovering on his counterclaim by virtue of Regulation 331.01, which states the "price at which an order for commodities is executed . . . shall be binding notwithstanding the fact that an erroneous report in respect thereto may have been rendered. . . ." The argument this forecloses any recovery by Heim must fail. Regulation 331.01 contains an express exception to the rule of nonliability. That exception is contained in Regulation 350.04, which *on its face* states that "[a]ny loss resulting from an error or mishandling of an order for a customer must be borne by the commission house and/or broker depending on who made the error." Under this regulation, the trial court and the jury could find Heim was not barred from recovering for negligence on Hutton's part. The point lacks merit.

Hutton's second issue on appeal is the trial court erred in denying plaintiff's motions for directed verdict and judgment notwithstanding the verdict or, in the alternative, for a new trial. Plaintiff argues the evidence at trial showed the September 29 commodity trade was erroneously reported by the CBOT floor trader over whom Hutton had no supervisory authority. For this reason Hutton urges that under the CBOT Regulations 331.01 and 350.04, the floor trader alone is liable to Heim for the resulting losses.

In *Sampson v. Hunt,* 233 Kan. 572, 578, 665 P.2d 743 (1983), the Court stated:

"In ruling on a motion for directed verdict pursuant to K.S.A. 60-250 the court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought, and where the evidence is such that reasonable minds could reach different conclusions thereon, the motion must be denied and the matter submitted to the jury. The same basic rule governs appellate review of a motion for directed verdict. [Citations omitted.] The question is not whether there is literally no evidence supporting the party against whom the motion is directed, but whether there is evidence upon which the jury could properly find a verdict for that party. Even where facts are undisputed it is possible that conflicting inferences may be drawn from those facts, and where that is true, the issue must be submitted to the jury. [Citations omitted.] Where no evidence is presented on a particular issue, or the evidence presented is undisputed and it is such that the minds of reasonable persons may not draw differing inferences and arrive at opposing conclusions with reason and justice, the matter becomes a question of law for the court's determination. [Citations omitted.]"

In the context of this case, the question is: Was there any evidence upon which the jury could find Hutton liable for negligence in conveying to Heim the erroneous price quotation? We conclude there was and therefore find no error in the lower court's denial of plaintiff's motions.

While Hutton places great reliance on testimony of its own employees that the floor brokers were independent contractors, the jury evidently found otherwise. Although it is the customary practice for brokerage firms to entrust actual execution of their orders to other members, or floor brokers, of a particular exchange, it has been said:

"[T]he 'specialist' or other floor broker so retained is *the sub-agent of the customer's broker and not the agent of the customer.* His acts and omissions are deemed those of the customer's broker, so far as the relations between the customer and the broker are concerned. The customer's broker is responsible to the customer for a negligent or improper execution by the 'specialist' or floor broker." (Emphasis added.) Meyer, The Law of Stock Brokers and Stock Exchanges, Sec. 122 (1931).

See also 1 Black, The Law of Stock Exchanges, Stockbrokers and Customers, Sec. 333 (1940). Even if we were to agree that in the ordinary situation the floor broker is an independent contractor for whose negligent errors Hutton was not responsible, the facts of this case would also support a finding of negligence on the part of Hutton itself or a finding that Hutton ratified the floor

broker's act in erroneously reporting the price of the May soybean contract. Here, Heim, who had been monitoring the market at home, was evidently suspicious of the $8.52 per bushel quote and specifically requested Hutton to confirm the transaction. Hutton did nothing more than go back to the original floor broker who referred to his trading notes which contained the original error. He then reported back to Hutton the same erroneous information he had originally given and that information was accepted by Hutton as sufficient confirmation without using other informational sources available to independently confirm the transaction price. The jury having found Hutton 85% negligent and the Chicago floor brokers 0% negligent has resolved the fact issue against Hutton. The various motions were properly denied.

Hutton's third issue is that Heim's execution of the April 15, 1981, promissory note constituted an accord and satisfaction which precludes any recovery bʄ Heim. The trial court instructed the jury on the law of accord and satisfaction and Hutton raises no complaint regarding the adequacy of those instructions. The jury clearly rejected Hutton's theory, and that finding is now before us. A negative finding indicates that the party upon whom the burden of proof is cast did not sustain the requisite burden, and on appeal the negative finding will not be disturbed absent proof of an arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion or prejudice. *Lostutter v. Estate of Larkin,* 235 Kan. 154, 162-63, 679 P.2d. 181 (1984).

Accord and satisfaction is an affirmative defense and must be proven by a preponderance of the evidence. *Addis v. Bernardin, Inc.,* 226 Kan. 241, Syl. ¶ 1, 597 P.2d 250 (1979). In this case Hutton raised the claim, and thus bore the burden of proof. To constitute an accord and satisfaction, there must be an offer in full satisfaction of an obligation, accompanied by such acts and declarations or made under such circumstances that the party to whom the offer is made is bound to understand that if he accepts the offer, it is in full satisfaction of and discharges the original obligation. *Lippert v. Angle,* 215 Kan. 626, 630, 527 P.2d 1016 (1974). An accord and satisfaction, as an adjustment of a disagreement as to what is due from one party to another through payment of an agreed amount, must be consummated by a

meeting of the minds and accompanied by sufficient consideration. *Barnes v. Mid-Continent Casualty Co.*, 192 Kan. 401, 388 P.2d 642 (1964).

Hutton's claim the promissory note in this case constituted an accord and satisfaction lacks merit. It is undisputed that at the time defendant executed the note on April 15, 1981, he had not received a copy of CBOT Regulation 350.04 and was under the belief Regulation 331.01 forced him to bear the full risk of any losses resulting from the mistakes of Hutton or the floor trader. When Heim executed the note he was under the impression he had no further recourse against Hutton for his losses, but was simply indebted to the company for the debit balance in his margin account. Under these circumstances it is impossible to say the note was in satisfaction of an obligation from Hutton to Heim, when at that time Heim was not even aware such an obligation might exist. At no point was there the requisite "meeting of the minds" to support an accord and satisfaction, and the jury properly rejected Hutton's argument. Ironically, the claim would be much more persuasive had Hutton fully disclosed *both* CBOT regulations in its letter to Heim on October 2, 1980, rather than merely the one regulation which created the mistaken impression the broker would not be liable in any case involving error. No error is shown on this issue.

The last issue on appeal concerns the trial court's instruction to the jury on the measure of damages. The instruction in question read:

"If you find for the Defendant then you should determine the amount of damages that the Defendant is entitled to receive by ascertaining the best obtainable price for the particular commodity contract that would have existed during the thirty (30) day period following September 29. You will then determine the difference between the best obtainable price and the price actually received by the Defendant and such difference is the amount of damages to be awarded the Defendant.
"The total amount of your verdict may not exceed the sum of $193,300.00, the amount of Heim's claim."

We agree the instruction was erroneous.

The trial court based the instruction on *Shearson Hayden Stone, Inc. v. Perrier*, 7 Kan. App. 2d 89, 638 P.2d 359 (1981). While Perrier unquestionably resembles the present case in many respects, there are also some crucial differences. Plaintiff Shearson Hayden Stone, Inc. was a brokerage firm suing one of

its customers for the balance due on his commodities trading account. Defendant Perrier counterclaimed for damages. He had entered the market in a short position on feeder cattle with an initial margin requirement of $20,000.00. Within a few days, due to an increase in the price of cattle, his margin requirement had risen to $27,904.00. Defendant delayed payment of the margin call, and plaintiff took him out of the market by purchasing enough offsetting cattle contracts to cover the short position. These contracts were purchased at a price resulting in a $12,012.00 loss on the transaction. In plaintiff's suit to recover that amount, Perrier claimed he was entitled to damages for the broker's "wrongful cover" of his short position. The trial court denied recovery to both parties, and the broker appealed.

The Court of Appeals, on the assumption the plaintiff wrongfully purchased contracts to cover defendant's short position, announced the following rule concerning damages:

"[W]e hold it correct to say the measure of damages rule for a broker's unauthorized and wrongful purchase to cover its customer's short position in commodities futures trading is the difference obtained upon subtraction of (1) the lowest market price between (a) the time the customer has notice of the covering purchase and (b) a reasonable time thereafter for the customer to decide whether to go into the market to renew, or reinstate, his short position, from (2) the price paid to cover." *Perrier*, 7 Kan. App. 2d at 95.

Utilizing 30 days as a reasonable time under this rule, it was determined that Perrier suffered no loss as a result of the wrongful act of the broker and that the broker was entitled to recover the amount due on the margin account. Variations of the rule announced in *Perrier* have been applied in many jurisdictions and seems to have first been formulated by the Supreme Court in *Galigher v. Jones*, 129 U.S. 193, 32 L.Ed. 658, 9 S.Ct. 335 (1889), wherein the court stated:

"[T]he measure of damages in stock transactions of this kind is the highest intermediate value reached by the stock between the time of the wrongful act complained of and a reasonable time thereafter, to be allowed to the party injured to place himself in the position he would have been in had not his rights been violated." 129 U.S. at 200.

See also *Schultz v. Commodity Futures Trading Com'n*, 716 F.2d 136 (2d Cir. 1983); *Chipser v. Kohlmeyer & Co.*, 600 F.2d 1061 (5th Cir. 1979); *Mitchell v. Texas Gulf Sulphur Company*, 446 F.2d 90 (10th Cir. 1971); *Letson v. Dean Witter Reynolds*,

*Inc.,* 532 F.Supp. 500 (N.D.Cal. 1982); *Kaufmann v. Delafield,* 224 App. Div. 29, 229 N.Y.S. 545 (1928).

However, in all of the cases we have found which apply the *Perrier* rule or some variation thereof, the broker has been guilty of some wrongful conduct such as conversion, fraud, fraudulent inducement or similar intentional tortious acts. Here we are faced with a case of simple negligence in the reporting to Heim. In Heim's counterclaim he alleged only that Hutton "negligently furnished to the Defendant incorrect market information" on which Heim relied in making investment decisions. The issue is: What is the proper measure of damages to be awarded for a commodity broker's negligent misrepresentation of the market price at which a trade was executed? We have found no Kansas cases on this point and relevant cases from other jurisdictions are few. However, those that have been reported involving negligence in a securities or commodities transaction employ the customary negligence rule of damages based upon proximate cause.

In *Tark v. Shearson/American Express, Inc.,* 123 Ill. App. 3d 75, 462 N.E.2d 610 (1984), plaintiff sued defendant, a securities broker-dealer, for negligent misrepresentation. Plaintiff was in a "long" position on cotton contracts in the commodities market. However, when the price of cotton went into a steep decline plaintiff was faced with a series of margin calls to secure that position. At one point plaintiff ordered Shearson to sell the securities remaining in his securities account and transfer the proceeds to his commodities account. The price of cotton futures continued to fall, and defendant demanded plaintiff deposit $16,000 in his commodities account. Unable to meet this margin, plaintiff ordered defendant to liquidate all the contracts in the commodities account. After beginning this liquidation, Shearson " 'found' " an additional $16,000 in the account from plaintiff's previous sale of securities, which had not been properly credited. The broker attempted to salvage the contracts plaintiff had ordered liquidated, but was able to recover only short contracts. At trial defendant conceded that if the proceeds from the sale of securities had been properly credited, defendant would not have issued the $16,000 margin call. Plaintiff argued he should recover his actual out-of-pocket losses. The trial court gave the jury an instruction requested by Tark, which is virtually identical to that sought by Hutton in this case:

"If you decide for plaintiff on the question of liability, you must then fix the amount of damages which will reasonably and fairly compensate him for the losses plaintiff sustained as a result of defendant's negligence."

The jury returned a verdict of $65,000. On appeal the broker challenged the instruction. In upholding the instruction, the appeals court stated:

"In considering the measure of damages, we wish to make it clear that the record shows no evidence of wilful misconduct by the defendant or its agents. We are dealing here with a simple negligent error such as could happen during operation of any business. However, plaintiff is entirely without fault and he was simply led far astray by the mistaken information given to him by the broker. Undoubtedly plaintiff acted in reliance upon the erroneous impression he had thus received. As a result plaintiff suffered losses for which he should be properly compensated.

"The operation of a commodities exchange and the activities resulting there-from are simply a refined form of gambling. Thus, as negligent acts are unavoidable, it should be reasonably anticipated that losses of various kinds occur. Thus, courts have adopted diverse methods of fixing the measure of damages. As we would expect, the cases differ widely in formulating the measure of damages depending upon the varied factual backgrounds in the particular litigation before the court. [Citations omitted.]

"[I]n the instant case, the instructions submitted by defendant in this regard were definitely not acceptable. The above given instruction, presented by plaintiff, is simple, clear and succinct and very close to the form suggested in the IPI. In our opinion, the careful trial judge had no alternative but to adopt the instruction tendered by plaintiff." *Tark,* 123 Ill. App. 3d at 79-80.

Analogous cases exhibit a similar approach. In *Twomey v. Mitchum, Jones & Templeton, Inc.,* 262 Cal. App.2d 690, 731 n. 12, 69 Cal. Rptr. 222 (1968), a customer's suit against an investment banking and stock brokerage business, the court held that for breach of the fiduciary relationship between the broker and customer, the proper measure of damages is "the amount which will compensate for all the detriment *proximately caused* thereby, whether it could have been anticipated or not." (Emphasis added.) The Florida Court of Appeal has held that a broker's liability for negligence in handling a stock transaction is limited to the loss proximately caused by that negligence, and it will not be further liable for a subsequent decline in the value of other stock retained where the selection and purchase of that

stock is attributable solely to the customer. *Hayden, Stone Incorporated v. Brown,* 218 So.2d 230 (Fla. Dist. App. 1969). In a breach of contract action against a brokerage firm for demanding margin from a customer far in excess of that authorized by their contract, the Texas Court of Civil Appeals upheld a verdict for the damages proximately caused by the brokers' actions. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Miller,* 401 S.W.2d 645, 647-48 (Tex.Civ.App. 1966); *cf. Loeb, Rhoades & Co. v. Stanley,* 541 S.W.2d 869 (Tex.Civ.App. 1976).

The distinction recognized by the Illinois Appellate Court in *Tark,* between wilful misconduct by a broker and its agents and simple negligence, is particularly appropriate in the present case. The *Perrier* measure of damages holds the broker liable for fluctuations in the value of stock or commodities for a reasonable time after the customer has been deprived of ownership and control by the broker's wilful misconduct. To apply that measure of damages where there has been no wilful misconduct or unauthorized assumption of control over the securities opens the broker to liability for fluctuations in value that are properly borne by the customer. The unfairness of such a rule is shown in this case. Clearly Hutton was negligent in misrepresenting the price at which the September 29 sell transaction occurred. But that conduct was neither claimed nor shown to be wilful or aggravated; nor was Heim ever deprived of his ownership of and right to control the commodities contracts as he saw fit. The application of the *Perrier* measure of damages to these facts allowed Heim to recover losses in the value of the commodities both prior to and for the thirty days following Hutton's negligence. While we voice no opinion on the soundness of the *Perrier* rule in an appropriate case, we are convinced it does not apply in a case of ordinary negligence.

Hutton requested an instruction based upon PIK Civ. 2d 9.40 in the following form:

"If you find for the defendant, then you must award defendant such sum as you believe will fairly and justly compensate the defendant for the damages you believe defendant sustained as a result of the occurrence complained of by defendant."

We think the requested instruction was proper and should have been given along with other instructions appropriate in an action for negligence. In an action against a broker for negli-

gently reporting a stock or commodity transaction and where there was no wrongful conduct on the part of the broker (other than negligence), the proper measure of damages is the same as in any negligence action which does not involve intentional or gross and wanton conduct. As this case has been fully tried on the issues of liability and fault and as the only reversible error shown is in the proper measure and determination of damages, it will be remanded for a new trial solely on the issue of the amount of damages incurred by the defendant.

The judgment of the trial court as to damages is reversed and the case is remanded for a new trial on the issue of damages only in accordance with the views expressed in this opinion.