**CEDAR VALE COOPERATIVE EXCHANGE, INC., Appellee/Cross–Appellant,**

v.

**PETROLEUM PRODUCTS (MIDWEST), INC., Appellant/Cross–Appellee.**

**Civ. A. No. 91–1464–MLB.**

United States District Court, D. Kansas.

Jan. 11, 1993.

Dan W. Forker, Jr., Reynolds, Peirce, Forker, Suter & Rose, Hutchinson, KS, for appellant/cross-appellee.

Ron D. Beal, Klenda, Mitchell, Austerman & Zuercher, Wichita, KS, for appellee/cross-appellant.

## MEMORANDUM AND ORDER

BELOT, District Judge.

This case comes before the court on Petroleum Products, Inc.'s (PPI) appeal of the bankruptcy court's decision denying PPI's counterclaim in an adversary proceeding brought by Cedar Vale Cooperative Exchange, Inc. (Cedar Vale) (Doc. 1) The bankruptcy court ruled that PPI was not entitled to damages for lost profits due to Cedar Vale's withholding of a customer list. Cedar Vale has filed a cross-appeal of the bankruptcy court's finding that it breached its contract with PPI. (Doc. 2)

Cedar Vale, a cooperative organized under Kansas law, operated a retail propane and gasoline business in Cedar Vale, Kansas. Cedar Vale filed a Chapter 11 bankruptcy petition on November 2, 1990. It executed a contract to sell most of its propane related assets for $70,000 to Orville L. Bair, d/b/a Bair's LP Gas on November 8, 1991. Before the prospective sale was noticed out, PPI learned Cedar Vale's assets were for sale and offered to purchase them for $71,000. Cedar Vale accepted PPI's offer, and a contract[1] was executed on November 12, 1990, subject to bankruptcy court approval. The contract called for Cedar Vale to turn over possession of the property described in the agreement upon proof that adequate insurance had been secured.

A dispute arose shortly after the contract was executed when Cedar Vale, through its attorney, refused to deliver Cedar Vale's customer lists. PPI presented evidence that it had procured insurance on November 19, 1990, but Cedar Vale refused to surrender possession of the customer list, although it did deliver the keys to the propane truck and the propane tanks. In the mean time, PPI assembled a list of former and potential propane customers using a "route book" found in the propane truck as well as the memory of a former Cedar Vale employee, Tim Stone. The list contained approximately 169 names and addresses. On November 16, 1990, PPI sent a form letter to everyone on the list for

whom an address could be located soliciting propane purchases. A similar letter soliciting purchases was mailed on December 5, 1990. A third solicitation letter was mailed in January, 1991.

Cedar Vale eventually turned over the customer list to PPI on December 12, 1990. The evidence at trial revealed that 43 persons on the customer list did not purchase propane from PPI through June, 1991.

The bankruptcy court ruled Cedar Vale breached its contract by failing to deliver the customer list upon presentation of proof of insurance on November 19, 1990. Notwithstanding the breach, the court ruled PPI had failed to demonstrate any causal connection between Cedar Vale's failure to deliver the customer list and either a loss of customers or sales.

### Standard of Review

■ Bankruptcy Rule 8013 sets forth the standard of review for appeals from Orders of a Bankruptcy Court. Findings of fact will be upheld "unless clearly erroneous". *In re Burkart Farm and Livestock*, 938 F.2d 1114, 1115 (10th Cir.1991). Findings of fact are clearly erroneous if the appellate court has the definite and firm conviction that a mistake has been committed after reviewing the entire record. *Hall v. Vance*, 887 F.2d 1041, 1043 (10th Cir.1989). The bankruptcy court's conclusions of law are reviewed *de novo*. *Burkart*, 938 F.2d at 1115.

### Cross–Appeal

Cedar Vale argues the bankruptcy court erred in finding it breached its contract by withholding the customer list until December 12, 1991. Alternatively, it argues the parties entered into an accord and satisfaction of their dispute, or a subsequent modification of their agreement.

Paragraph 5 of the contract provided in part:

Buyer is in the process of securing adequate insurance against casualty loss to the sale property in an amount equal to or greater than the price bid for the

---

1. Cedar Vale's customer lists were specifically listed among the assets being conveyed.

property. Upon proof that adequate insurance has been secured naming the Seller and Buyer as loss payees, Buyer will be granted possession of the property referenced herein ...

Paragraph 1 of the contract specifically listed Cedar Vale's customer lists as personal property PPI agreed to purchase. Cedar Vale argues that the customer lists were not included as "property" within the meaning of paragraph 5 and therefore it was not required to turn the lists over to PPI when presented with proof of adequate insurance. Cedar Vale contends the inclusion of customer lists within the meaning of "property" would mean that PPI must obtain insurance coverage over the customer lists. This interpretation, if accepted, would mean that the parties meant to exclude the customer lists from the property Cedar Vale agreed to turn over on November 19.

■ The general rule is that the meaning of the parties and the meaning of a contract are to be determined from the plain, general, and common meaning of terms used. *Wood River Pipeline Co. v. Willbros Energy Services Co.*, 241 Kan. 580, 586, 738 P.2d 866 (1987) (Citation omitted). Doubtful language in a contract is construed most strongly against the party preparing the instrument. *Id.*[2]

■ The court finds no ambiguity in the contract. The customer lists, along with the other listed property in paragraph 1, were to be turned over to PPI at the time PPI produced proof of adequate insurance as provided in paragraph 5. Forcing PPI to obtain insurance on the customer lists is an unreasonable interpretation of the contract and clearly was not within the contemplation of the parties. In any event, Cedar Vale's attorney drafted the contract. If Cedar Vale had meant to delay turning over the customer lists until a later date, it could have expressly stated so in the contract. In fact, the reason Cedar Vale withheld the lists was to maintain some leverage over PPI. According to the testimony of Richard Urie, Cedar Vale's manager,

Cedar Vale withheld the customer list upon the advice of its attorney, who told Urie "we were going to hang on to it to protect it until the closing."

■ Our construction of the contract renders Cedar Vale's claim of accord and satisfaction unavailing. An accord and satisfaction requires that a dispute exist between the parties that is capable of adjustment. *E F Hutton & Co. v. Heim*, 236 Kan. 603, 610–11, 694 P.2d 445 (1985). The court holds that the parties had an agreement, and thus no dispute existed.

The court finds no credible evidence in the record to support Cedar Vale's argument that the parties entered into an agreement modifying the terms of the contract. The only evidence is the testimony of Cedar Vale's attorney, who was asked by PPI to take possession of the customer list on November 12, 1990. In no way does this testimony modify Cedar Vale's obligation to turn over the customer list upon receiving adequate proof of insurance.

The bankruptcy court's finding that Cedar Vale breached the contract is affirmed.

### Appeal

■ PPI argues the withholding of the customer list by Cedar Vale for the 23 day period between November 19 and December 12 hindered its ability to contact Cedar Vale's propane customers and caused it a loss of profits. The parties agree that 43 persons on the customer list ultimately did not purchase propane from PPI. PPI offered evidence, through the testimony of its president, Marty Burke, that approximately 90% of the customers of a retail propane business remain with the business when it is sold. PPI calculates its lost profits as 90% of 43 multiplied by the average amount of propane a customer uses in one year times the profit it makes on each gallon.

The interpretation of a contract in a bankruptcy proceeding is governed by state law. *Matter of Topco, Inc.*, 894 F.2d 727, 738 (5th Cir.1990). The general rule in

---

**2.** The court noted this principle was of little consequence in the case before it because of the particular circumstances of the case. 241 Kan. at 587, 738 P.2d 866.

Kansas is that a plaintiff can recover for loss of profits resulting from a breach of contract when it proves such profits with "reasonable certainty" and shows that "they may reasonably be considered to have been within the contemplation of the parties." *Vickers v. Wichita State University*, 213 Kan. 614, 618, 518 P.2d 512 (1974) (Citations omitted). "Recovery for loss of profits caused by a breach of contract depends upon the facts and circumstances of each particular case." *Id.*

The difficulty with PPI's position is that the majority of the 43 customers PPI claims to have lost as a result of Cedar Vale's failure to deliver the list were actually known and contacted by PPI prior to their receipt of the customer list on December 12, 1990. The evidence indicates 29 of the 43 customers received a solicitation letter from PPI on November 16, 1990, three days prior to the date PPI acknowledges Cedar Vale was required to deliver the customer list. PPI also knew, prior to November 19, the identity, but not the addresses, of 9 of the 14 customers who did not receive the November 16 solicitation letter. Furthermore, Richard Urie testified that 4 other customers on the list were either no longer in business, had moved out of the area, or were later solicited by PPI.

The net effect of this evidence is that PPI was able to and actually did contact virtually all of the 43 customers it now claims to have lost due to the delay in receiving the customer list. PPI's contention that it was deprived of the opportunity to make personal contact with the 43 customers is simply not credible. PPI had the opportunity to discover most of the 43 names with reasonable diligence. In light of this fact, the court cannot conclude PPI has established it suffered lost profits with "reasonable certainty". The bankruptcy court's finding of no causal connection between the lack of contact and the loss of customers is not clearly erroneous and must be affirmed.

IT IS SO ORDERED.