The **PEOPLES NATIONAL BANK,**
**CLAY CENTER, KANSAS,**
Plaintiff,

v.

**PURINA MILLS, INC., Defendant.**

No. 95–4077–SAC.

United States District Court,
D. Kansas.

June 20, 1996.

Gary H. Hanson, Stumbo, Hanson & Hendricks, Topeka, KS, Tim W. Ryan, Ryan & Ryan, P.A., Clay Center, KS, for plaintiff.

Kathryn Gardner, Terry L. Malone, Richard K. Thompson, Martin, Pringle, Oliver, Wallace & Swartz, Wichita, KS, for defendant.

## MEMORANDUM AND ORDER

CROW, District Judge.

The case comes before the court on the plaintiff's motion for partial summary judgment (Dk. 34) and the defendant's motion for summary judgment (Dk. 36). The Peoples National Bank ("Bank") sued Purina Mills, Inc. ("Purina") alleging breach of a "Non-Funded Participation Agreement" ("NFPA"), in which Purina agreed to fund a percentage

of the Bank's line of credit to Douglas and Maureen Toll ("Tolls") in the event that the Tolls defaulted on the loans. The Tolls defaulted on the loans and filed for bankruptcy. Purina has refused to fund the loan taking the position that it is excused from performance due to the Bank's breaches of the NFPA.

The Bank moves for partial summary judgment on Purina's contentions that the Bank materially breached the NFPA thus relieving Purina from performance under it. Purina moves for summary judgment arguing it is not liable because the Bank materially altered Purina's obligations as guarantor, because the Bank substantially impaired the collateral, or because the NFPA expired by its own terms. Purina requests oral argument on its motion. The court denies the request as oral argument would not materially assist the court.

## SUMMARY JUDGMENT STANDARDS

■■■ A court grants a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. The court is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine issue of fact." *Burnette v. Dow Chemical Co.,* 849 F.2d 1269, 1273 (10th Cir.1988).

■■■ The initial burden is with the movant to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.,* 968 F.2d 1022, 1024 (10th Cir.), *cert. denied,* 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). If this burden is met, the nonmovant must "come forward with specific facts showing that there is a genuine issue for trial as to elements essential to" the nonmovant's claim or position. *Martin v. Nannie and Newborns, Inc.,* 3 F.3d 1410, 1414 (10th Cir.1993) (citations omitted). The nonmovant's burden is more than a simple showing of "some metaphysical doubt as to the material facts," *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356; it requires " 'present[ing] sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor.' " *Thomas v. International Business Machines,* 48 F.3d 478, 484 (10th Cir.1995) (quoting *Bacchus Industries, Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991)). The court views the evidence of record and draws all reasonable inferences in the light most favorable to the nonmovant. *Id.* A party relying on only conclusory allegations cannot defeat a properly supported motion for summary judgment. *White v. York Intern. Corp.,* 45 F.3d 357, 363 (10th Cir.1995).

■■■ More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences. *Windon Third Oil and Gas v. Federal Deposit Ins.,* 805 F.2d 342, 346 (10th Cir. 1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

## STATEMENT OF UNCONTROVERTED FACTS

For purposes of deciding the pending motions, the court accepts the following as the statement of uncontroverted facts:

1. When their primary agricultural lender decided to end business relations with them,

Doug and Maureen Toll ("Tolls") approached the Peoples National Bank in Clay Center, Kansas ("Bank"). Purina assisted the Tolls in making their credit proposal.

2. In July of 1991, the Bank agreed to extend a revolving line of credit to the Tolls in the amount of $360,000. As part of the financing arrangement, the Bank entered into a Non–Funded Participation Agreement ("NFPA") with Purina, dated August 2, 1991. The form used for the NFPA came from Purina's credit manual.

3. The NFPA was an incentive for the Bank to finance the Tolls' hog operation, and it enabled Purina to continue its profitable cash sales of feed to the Tolls.

4. The NFPA provided that Purina would fund 41.7% of the loan in the event that the Tolls defaulted. The NFPA had a one-year term and was not automatically renewable. In fact, it was contemplated that Purina would participate in the financing arrangement for only one year. Despite this understanding, Purina entered into a second NFPA dated October 21, 1992.

5. Purina entered into a third NFPA dated January 20, 1994. It covered the same $360,000 revolving line of credit that was maintained as two separate line-of-credit promissory notes in the principal amounts of $240,000 and $120,000, respectively. The NFPA also provided as before that in the event of default and upon the Bank's request Purina would "promptly fund its share of the loan in the amount of 41.7% of the loan advanced, not to exceed a total advancement, in the aggregate by Purina of $150,000."

6. The third NFPA further provided that the Bank and Purina agreed that "[t]he terms and conditions of this Loan are set forth in the following ... security documents ... (b) Security Agreement dated December 30, 1993 covering all livestock, machinery and equipment and crops."

7. In the security agreement, the Tolls gave the Bank a security interest that secured "payment of all ... [their] present and future obligations of any type to the ... [Bank], including without limitation, future advances,...." This cross-collateralization provision applied to all of the Tolls' debt held by the Bank.

8. At the time of the third NFPA, the Bank also told Purina that it had approved an increase in the Tolls' credit line to $510,-000. The Bank informed Purina that it had loaned the Tolls an additional $150,000 in a term loan that was not covered by the NFPA. The Bank did not provide Purina with copies of the term promissory note, and Purina did not know any of the specific terms and conditions of the separate term note.

9. The two line-of-credit promissory notes covered by the NFPA and the term promissory note not covered by the NFPA contained the same description of collateral: "Security for the loan is a separate security agreement dated December 30, 1993, listing all crops, machinery and equipment and livestock."

10. Purina disclaims any knowledge prior to signing the NFPA that the Bank would claim in the event of default that the non-NFPA term loan gave the Bank superior or equal priority to collateral otherwise covered by and listed on the NFPA.

11. Brian Bilyeu, Purina's representative at the time of the first NFPA, testified he understood that Bank had a separate loan which was not covered by the NFPA and which was secured by machinery and equipment. He further understood that the NFPA loans were secured by livestock and that in the event of default the respective collateral proceeds would be applied to the corresponding loans. Bilyeu did not remember any discussion with the Bank's representative that all collateral proceeds would be applied first to the NFPA loans.

12. In the latter part of 1994, the hog market suffered serious price declines. In November, the Bank determined that it was not adequately secured.

13. By letter dated November 7, 1994, the Bank wrote Purina the following:

This letter is (sic) advise you The Peoples National Bank is requesting the Non Funded Participation Agreement dated January 20, 1994 be funded to the maximum amount of $150,000 as soon as possi-

ble; but in any event no later than November 10, 1994.

Due to the rapid decline in the hog markets we believe there is insufficient security to properly collateralize our loans.... We further believe this places the loan in default under Section 9 of the agreement and we are advising you today of our intent to deem the bank insecure and request funding of the participation by the date specified above.

(Dk. 35, App. F).[1]

14. Purina and the Bank agreed to advance the Tolls additional sums for finishing the hogs to market weight. Thus, the Bank continued advancing the Tolls money, some of which may have been made for purposes other than purchasing hog feed. Purina did not agree to extensions or advances of loans for any other purposes.

15. Following the Bank's demand for funding in November of 1994, Purina submitted a "Post–Funded Agreement" drafted by its attorneys. This agreement provided in part that all collateral proceeds would be applied to NFPA loans first. The Bank refused to sign this agreement, in part, because it gave the NFPA loans priority to all collateral.

16. In April of 1995, the Bank filed an action against the Tolls and others in Washington County, Kansas, to collect on the defaulted promissory notes. In June of 1995, the Tolls filed a chapter 13 petition for bankruptcy, thus staying the state court proceeding. In August of 1995, the Bank settled this action against the Tolls by selling the remaining collateral to Doug Toll's mother, Irene Toll, for $212,117.00. The Bank applied these proceeds first to the non–NFPA term note and the remaining proceeds to the two NFPA line-of-credit notes.

17. On the assignment of collateral, the NFPA provides in pertinent part:

This Agreement and the rights and interests of the parties herein and in the Loan, the Loan Documents and any collateral for the Loan shall not be assigned by any party without prior written consent of the other.

18. On the alteration of terms of the loans, the NFPA provides in pertinent part:

Bank shall have full power and authority to make or consent to any alteration in the terms of the Loan Documents, accelerate the maturity of the Loan or waive, release or alter any claim against the Borrower or any other parties to the Loan Documents so long as any such action or inaction is in the same exercise of care Bank would use if the Loan were held wholly for its own account. However, Bank will take the following actions only with Purina's consent: (1) consent to any change in the interest rate of the Loan;

. . . .

(3) release any security given under the Loan Documents.... When Purina's consent is required, Purina agrees not to unreasonably withhold such consent, provided that security of comparable value is submitted....

19. The Bank changed the interest rate on the line-of-credit notes to the Tolls a number of times during the term of the NFPA. The changes included: from 9% to 9½% on August 18, 1994, from 9½% to 10% on November 17, 1994, from 10% to 10¼% on February 13, 1995, and from 10¼% to 10% on July 17, 1995.

## SUBSTANTIVE LAW GOVERNING THIS ACTION

A federal court exercising diversity jurisdiction looks to the forum state for the substantive law, including the choice of law rules. *Barrett v. Tallon*, 30 F.3d 1296, 1300 (10th Cir.1994). The choice of law rules in Kansas permit the court to enforce the law which the contracting parties have chosen in their agreement. *Equifax Services, Inc. v. Hitz*, 905 F.2d 1355, 1360 (10th Cir.1990); *O.V. Marketing Associates, Inc. v. Carter*, 766 F.Supp. 960, 964 (D.Kan.1991). The parties here agreed that the NFPA would "be deemed a contract made and entered into

1. Purina argues that the Bank did not declare the loans in default until March of 1995. While the March letter to the Tolls carries the appellation of "Notice of Default," the Bank's November letter plainly says that it considered the loans to be in default and that Purina was required to fund immediately its participation in the loans.

under the laws of the State of Missouri for all purposes including both construction and remedy." There is no dispute that the court should enforce this choice of law provision in the NFPA and look to Missouri law as the governing law.

## NATURE OF THE NFPA

 Purina argues the NFPA bears all the indicia of a guaranty contract under Missouri law. There is a promisor (Purina), a creditor (Bank), and a debtor (Tolls). Purina's liability does not arise in the absence of a liability on principal obligation. The Bank not only does not contest Purina's reliance on Missouri law governing guaranty contracts, but looks to the same area of law for its authority. The court agrees with the parties that the participation agreement in this case closely resembles a guaranty contract. In the absence of contrary arguments or authorities, the court will apply Missouri law on guaranty contracts.

## MISSOURI LAW ON GUARANTY

 "A guaranty is collateral to and independent of any underlying agreement, and a guarantor's liability is primarily dependent upon the guaranty agreement itself." *Boatmen's Bank v. Community Interiors, Inc.*, 721 S.W.2d 72, 79 (Mo.App.1986) (citing *Standard Meat Co. v. Taco Kid,* 554 S.W.2d 592, 595 (Mo.App.1977)). It is well settled in Missouri that a guarantor's liability "is limited by the specific terms of the" guaranty contract. *Kirkland v. Todd,* 856 S.W.2d 936, 939 (Mo.App.1993); *see Royal Banks of Missouri v. Fridkin,* 819 S.W.2d 359, 362 (Mo. banc 1991). The guaranty agreement is to be construed strictly in favor of the guarantor. *Central City Ltd. Partnership v. United Postal Sav. Ass'n,* 903 S.W.2d 179, 183 (Mo. App.1995). The terms of the guaranty may not be stretched, extended, or implied so as to make the guarantor liable. *U.S. Suzuki Motor Corp. v. Johnson,* 673 S.W.2d 105, 107 (Mo.App.1984).

 The general rules of contract construction apply to a guaranty. *Fridkin,* 819 S.W.2d at 361. It is a question of law whether the guaranty is ambiguous, and the parol evidence rule bars extrinsic evidence in the absence of ambiguities. *Id.* "A contract is ambiguous only if its terms are susceptible of more than one meaning so that reasonable persons may fairly and honestly differ in their construction of the terms." *Central City Ltd. Partnership,* 903 S.W.2d at 182 (citation omitted). A disagreement between the parties over a term does not necessarily mean the contract is ambiguous. *Id.* "Any ambiguity in a guaranty agreement should arise from the guaranty itself." *Boatmen's Bank v. Community Interiors, Inc.,* 721 S.W.2d at 79 (citation omitted). If unambiguous, the terms of the guaranty " 'are to be understood in their plain and ordinary sense, when read in the light of the surrounding circumstances and the object intended to be accomplished.' " *Ulreich v. Kreutz,* 876 S.W.2d 726, 728 (Mo.App.1994) (quoting *Johnson,* 673 S.W.2d at 107); *see Central City Ltd. Partnership,* 903 S.W.2d at 182. The guaranty "may be construed together with any contemporaneously executed agreements dealing with the same subject matter as an aid in ascertaining" the parties' intent. *Ulreich,* 876 S.W.2d at 728 (citation omitted). Still, the guarantor's liability is principally a matter of strictly construing the precise terms of the guaranty. *Id.*

 "A material alteration in *or departure* from the contract of guaranty without the guarantor's consent will discharge" the guarantor. *Fridkin,* 819 S.W.2d at 362–63 (underlining added). In deciding whether a material alteration has occurred, Missouri courts look to whether the guaranty, after the changes, still expresses the same contract, operates the same way, and has the same effect. *Kirkland v. Todd,* 856 S.W.2d at 939. "If the change enlarges or lessens the liability, it is material and vitiates the contract." *Id.* (citation omitted). This rule is well established in Missouri law:

> "[T]he rule is so strict that the courts will not stop to inquire whether the alteration was injurious or beneficial to the surety. The reason is that contracts of suretyship are strictly construed in favor of the surety, and he has a right to stand upon the exact contract he made; and no one, not even a court can change it in any respect...."

*Kirkland,* 856 S.W.2d at 939 (quoting *Missouri Finance Corp. v. Roos,* 226 Mo.App. 869, 47 S.W.2d 142, 146 (1932)).

## BANK'S APPLICATION OF PROCEEDS TO NON–NFPA NOTE

■ Neither side argues that the terms of the NFPA are ambiguous.[2] Purina agreed to participate in the $360,000 loan to the Tolls by funding 41.7% of the loan, or $150,000, in the event of the Tolls' default and the Bank's request. The Bank and Purina agreed that the terms of the Tolls' loan were set forth in the loan documents. The NFPA specifically described the "Security agreement dated December 30, 1993 covering All livestock, machinery and equipment and crops." The NFPA does not mention any loans other than the $360,000. Nor does it say that the collateral securing that loan is shared with other loans held by one or both parties to the guaranty.

The NFPA plainly sets out the rights of Purina and the Bank upon the Tolls' default:

> In the event of default under the Loan Documents and should the obligations under the Loan Document be accelerated as provided in paragraph 8 hereof, *the interests of Bank and Purina in the Loan and any collateral therefor shall be deemed ratably concurrent. Any payments received thereafter* from the Borrower or any other parties to the Loan Documents or *by liquidation of collateral,* application of deposits, or otherwise, *shall be applied to pro rata among the indebtedness held by Bank and the indebtedness held by Purina.*

The line-of-credit promissory notes covered by the NFPA defines default as occurring under several different circumstances, including when "the prospect of ... realization on collateral is significantly impaired." By its letter of November 7, 1994, the Bank advised Purina that the loans were no longer properly collateralized, that as a result the loans were in default, and that it was requesting Purina to fund the maximum amount of its participation, $150,000.

According to the previously quoted terms of the NFPA, upon the event of default declared in November of 1994, "the interests of Bank and Purina in the Loan and any collateral therefor shall be deemed ratably concurrent." Thus, Purina immediately became liable for 41.7% of the loan and acquired a 41.7% interest in all collateral securing this agreement. More importantly, Purina acquired an interest in the collateral that was not subordinate to the Bank's interest but was "ratably concurrent." Since the NFPA does not refer to any other agreements or loans in which the Bank may claim an interest, superior or not, to the same collateral, the court finds that the precise terms of the NFPA, strictly construed in consonance with their plain and ordinary meanings, expressly gives Purina an interest in all listed collateral that is concurrent with the Bank's claimed interest in the same collateral.

■ Despite this express provision, the Bank insists it has the right under common law to allocate collateral proceeds first to the debt not guaranteed. The general rule is that "[w]here collateral has been given by a debtor to secure several debts to the same creditor, the latter, *in the absence of contrary agreement,* may apply the proceeds of the collateral to the debt or debts he deems to be most precarious." *State Bank of Downs v. Moss,* 203 Kan. 447, Syl. ¶ 1, 454 P.2d 554 (1969) (underlining added); *see* Annotation, *Application of Payments as Between Debts for Which a Surety or Guarantor is Bound and Those for Which He is Not,* 57 A.L.R.2d 855, 858 (1958) ("Virtually all of the cases ... are in accord that *in the absence of an agreement* ..., the fact that a surety or guarantor is liable for one of several debts does not affect the rights of the debtor or creditor to designate the debt to which a voluntary payment ... shall be applied.") (underlining added). This case is not an instance where an agreement is absent; instead, the Bank here expressly agreed that "[a]ny payments received ... by liquidation of collateral, ..., shall be applied to pro rata

---

**2.** Without an ambiguity, the court is barred from considering the parol evidence offered in the form of Brian Bilyeu's testimony.

among the indebtedness held by Bank and the indebtedness held by Purina." Having agreed to this application of proceeds, the Bank is unable to claim the discretionary right to apply the collateral proceeds as it sees fit.

The court, however, finds that the Bank's erroneous application of the proceeds does not discharge Purina of its liability as guarantor. The NFPA provides its own remedy should Purina or the Bank have more than its pro rata share of payments or proceeds:

> If any party hereto received payment on the Loan in greater proportion than payments received by the other party hereto on the basis of the percentage of participation on the date the obligations were accelerated, whether the same are voluntary, involuntary, by operation of law, by application of collateral security of any kind or recovery from any guarantor, surety or the like, or by any other means, *the parties receiving such greater proportion shall pay to each of the other parties such sums, or shall purchase from each of them such participations in the Loan as shall be necessary to cause the party receiving such greater proportion to share the excess payment ratably with each of the other parties hereto in accordance with their percentage or participation hereunder. If as a result of legal process or otherwise, any sums are recovered from any party hereto causing it to receive less than its proportionate share of payments on the Loan determined on a ratably basis in accordance with its percentage of participation on the date the obligations were accelerated, appropriate further adjustments shall be made between Bank and Purina so as to equalize payments on such basis.*

As stated earlier, one of the reasons that a material alteration releases a guarantor is that a guarantor " 'has a right to stand upon the exact contract he made.' " *Kirkland,* 856 S.W.2d at 939 (quoting *Roos,* 47 S.W.2d at 146). Because the NFPA created a remedy for this very situation, discharge here would frustrate rather than uphold the exact terms of the guaranty. Purina is entitled to share

pro rata (41.7%) in all collateral proceeds, including those that the Bank previously applied to the term promissory note not covered by the NFPA.

**OTHER ALLEGED BREACHES BY BANK**

Purina also argues that the Bank materially altered the NFPA by changing the interest rate on the Tolls' loans and by making unauthorized advances to the Tolls after the NFPA-covered notes had matured and were in default. Purina claims that these circumstances did change its liability under the NFPA, but Purina offers no evidence to substantiate its position. Specifically, Purina does not demonstrate how interest rate changes affected its maximum liability on the promissory notes. In addition, the Bank called for Purina to fund its maximum liability of $150,000 in November of 1994, so the advances made after that date presumably did not increase Purina's maximum liability. Summary judgment proceedings are not the time for Purina to speculate over the material effect, if any, of the Bank's actions. Without proof that these circumstances changed its liability under the NFPA, the Bank is entitled to summary judgment on these arguments. *See Boatmen's Nat. Bank of St. Louis v. Nangle,* 899 S.W.2d 542, 546 (Mo.App.1995); *Fridkin,* 819 S.W.2d at 363.

**SUBSTANTIAL IMPAIRMENT OF COLLATERAL**

In light of its prior ruling that the NFPA gives Purina the right to share pro rata in the proceeds from all collateral securing the $360,000 loan, there appears to be no reason to decide the related arguments advanced here.

**EXPIRATION OF NFPA**

Purina argues the NFPA expired on January 20, 1995, by its own terms. Prior to the NFPA's expiration, the Bank demanded that Purina fund the maximum amount of $150,000 under the NFPA, and Purina refused the Bank's demand. Consequently, the Bank alleges that Purina breached the NFPA before it ever expired. Purina's defense based on expiration of the NFPA is without merit.

IT IS THEREFORE ORDERED that the Bank's motion for partial summary judgment (Dk. 34) and Purina's motion for summary judgment (Dk. 36) are granted in part and denied in part.