**GLENCORE GRAIN LIMITED, et al., Plaintiffs,**

v.

**SEABOARD CORPORATION, Defendant.**

**No. CIV.A. 01–2558–KHV.**

United States District Court, D. Kansas.

Jan. 21, 2003.

Kirk T. May, David J. Rempel, Rouse Hendricks German May PC, Kansas City, MO, for plaintiffs.

James D. Griffin, Jason R. Scheiderer, Blackwell Sanders Peper Martin LLP, Kansas City, MO, for defendant.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

Glencore Grain Limited, Hamilton, Bermuda and Glencore Grain Africa (Pty) Limited (collectively referred to as "Glencore") bring suit against Seaboard Corporation ("Seaboard") for breach of guaranty and promissory estoppel. This matter comes before the Court on *Plaintiffs' Motion For Summary Judgment* (Doc. # 33) and *Defendant Seaboard Corporation's Motion For Summary Judgment* (Doc. # 36), both filed October 11, 2002, and Seaboard's *Memorandum In Opposition To Plaintiffs' Motion For Summary Judgment And Cross Motion For Summary Judgment On The Graver And Bresky Letters* (Doc. # 43) filed October 28, 2002. For reasons set forth below, the Court sustains plaintiffs' motion for summary judgment, overrules defendant's initial motion for summary judgment and sustains defendant's cross-motion for summary judgment.

## I. Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Rule 56(c), Fed.R.Civ.P.; *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga, Okla.*, 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir.1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. *Applied Genetics*, 912 F.2d at 1241.

The Court must view the record in a light most favorable to the party opposing the motion for summary judgment. *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.*, 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. *Anderson*, 477 U.S. at 250–51, 106 S.Ct. 2505. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary

judgment in the mere hope that something will turn up at trial." *Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir.1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505.

## II. Facts

The following facts are undisputed or, if disputed, the Court notes each party's contention.

Glencore is engaged in commodity trading. At some point before 1999, it entered into contracts to sell grain to National Milling Company ("NMC"), a milling company in Zambia. On June 12, 1997, Glencore and NMC entered into a Joint Venture Agreement ("JVA") under which NMC agreed to purchase 160,000 metric tons of white maize by June, 2000.[1] The contract provided that the maize would be stored at NMC premises under the supervision of a company called SGS,[2] and that NMC would "uplift" or take possession of the maize as needed. NMC could not uplift grain without a "release instruction" from Glencore, however, and Glencore required prepayment for any release. NMC bore the risk of loss or deterioration in the quality of the maize in storage.

In November of 1998, some 27,000 metric tons of maize remained in storage under the JVA. At the time, Seaboard was considering whether to purchase NMC as a going concern. On November 10, 1998, NMC and Glencore agreed that if Seaboard purchased NMC, NMC would buy all of the remaining maize for $210.00 per metric ton. On November 22, 1998, Seaboard faxed Glencore a letter to confirm that Glencore would hold the contract price at $210.00 per metric ton. A week later, on November 30, 1998, Seaboard purchased NMC as a going concern.

In December of 1998 and the following months, Mark Daniels of Glencore and Kevin Neilson of Seaboard renegotiated several contracts, including the price of the maize under the JVA. During the renegotiations, Neilson represented that Seaboard would guarantee NMC's obligations under the JVA. Glencore asserts that in renegotiating the price under the JVA, it relied on Neilson's representations to its detriment.[3] *See Daniels Depo.* at 15:1–14 (*Plaintiffs' Exhibit 5*).

On December 18, 1998, some 17,100 metric tons of maize remained under the JVA. On behalf of NMC, Seaboard agreed to purchase all remaining grain for $217.78 per metric ton plus interest at $0.44 per metric ton per day beginning December 19, 1998. The parties agreed that the remaining terms of the JVA would apply and that NMC would uplift all remaining maize by March 31, 1999.

NMC did not uplift all remaining maize by March 31, 1999 and in fact, on April 16, 1999, some 8,280.715 metric tons remained under the JVA. NMC advised Glencore that it could sell 8,000 metric tons to the Food Reserve Agency ("FRA"), a Zambian government agency, but that it needed two

1. The record does not reveal the price per metric ton.

2. The record does not disclose the full name of SGS.

3. Seaboard disputes this contention arguing that after the renegotiations, on December 18, 1998, the parties agreed to a higher price. The record does not clearly reflect the terms and conditions—either before or after the renegotiations—which relate to price. Because this fact relates to plaintiffs' claim for promissory estoppel—on which Seaboard seeks summary judgment—the Court construes it in a light most favorable to Glencore.

weeks to pay for it.[4] Glencore refused to release any maize without prepayment or a guaranty, and NMC therefore asked Seaboard for assistance in purchasing the grain on credit.

On April 16, 1999, Ronald Graver, director of Seaboard milling operations, faxed the following statement to Glencore:

Regarding commodity purchases from [sic][NMC] from Glencore, Seaboard Corporation as 100% owner of NMC are fully aware of NMC's transactions with Glencore and support them in their performance with these transactions. Thank you for your attention to our needs and requirements at NMC.

*Plaintiffs' Exhibit* 20 (paragraph spacing omitted). Later the same day, Dave Dannov, vice president/treasurer of Seaboard's overseas and trading group, faxed Glencore the following letter:

In the event that NMC do[es] not make payment within 14 days of the release issued 16th April 1999 for 8,000 mt of white maze supplied under the Glencore, NMC Joint Venture Agreement, Seaboard Corporation will accept liability for the payment to Glencore for the said 8,000 mt of maize or whatever lesser remaining unpaid.

*Plaintiffs' Exhibit* 21. The parties agree that Dannov's letter created a guaranty but dispute whether Seaboard is liable under that guaranty. Dannov wrote the letter because he thought that Graver's letter was too general and not specific to the transaction which the parties contemplat-

ed. *See Dannov Deposition* at 52 11.1–17 (*Plaintiffs' Exhibit* 6). Dannov intended the letter to be "specifically related to the potential transaction with FRA." *Id.* at 45 11.6–10.

On April 16, 1999, Glencore issued an invoice in the amount of $1,851,816.29 for the remaining 8,280.715 metric tons of maize, but it did not release all of the maize at that time.[5] Instead, on April 16, 1999, it released 1,000 metric tons without requiring prepayment. *See Defendant's Exhibit* H. Three days later, on April 19, 1999 it released the remaining 7,280.715 metrictons—again without requiring prepayment.[6] *See Defendant's Exhibit* I. Glencore issued both release instructions "to the order of National Milling Company/Seaboard Corporation."[7] *Defendant's Exhibits* H and I.

By April 30, 1999, NMC had uplifted 3,764.90 metric tons of the 8,280.715 metric tons which Glencore had released on April 16 and April 19, 1999. Thus, even though NMC was required to uplift all remaining grain by March 31, 1999, some 4,515.815 metric tons remained in storage one month later, on April 30, 1999. That day, Glencore requested that by May 7, 1999, NMC pay for the 8,280.715 metric tons which it had released on April 16 and April 19, 1999 ( 3,764.90 metric tons which NMC had uplifted but not paid for and 4,515.815 metric tons which remained in storage).

On May 7, 1999—the stated deadline for payment—Steve Bresky, vice president of

---

4. Glencore contends that NMC asked it to release 8,280.715 metric tons for the deal.

5. Glencore contends that it did release all 8,280.715 metric tons on April 16, 1999, but it presents no sworn testimony to support its contention. *See Memorandum In Support Of Plaintiffs' Motion For Summary Judgment* (*"Plaintiffs' Memorandum"*) (Doc. # 34) filed October 11, 2002 at ¶ 21.

6. The record does not explain why Glencore released the grain on two separate dates.

7. Nela Gooding prepared the release instructions for Glencore. She "most probably" issued them to the order of NMC/Seaboard because Seaboard had guaranteed the release. *Gooding Depo.* at 26:13–16 (*Plaintiffs' Exhibit* 4).

Seaboard, wrote the following letter to Glencore:

.... Seaboard Corporation, through wholly-owned subsidiaries, owns 100 percent of NMC and is fully aware of NMC's transactions with Glencore and will support NMC in the performances with these transactions. This letter shall remain in full force and effect for 30 days from the date hereof.

*Defendant's Exhibit* K (paragraph spacing omitted). Seaboard asserts that the purpose of this letter was to provide "soft comfort" that NMC would uplift and pay for all grain within 30 days.

On May 7, 1999, Glencore wanted to continue doing business with NMC but knew that NMC was "slipping" in its performance of some contracts. It therefore issued an amended invoice for 3,764.900 metric tons—the amount which NMC had actually uplifted between April 16 and April 30, 1999. The invoice reflected that NMC had paid $800,000.00 for the 3,764.900 metric tons but still owed $41,952.11.[8] On the same date, Glencore issued a new release instruction which lowered from 8,250.715[9] to 1,000 metric tons the amount of additional grain which NMC could uplift and resumed its prepayment requirement.

On May 11, 1999, Glencore faxed NMC the amended invoice and release instruction of May 7, 1999 with the following note:

Attached please find amended invoice for releases 27 and 28. The tonnage was reduced from 8,280.715 mt due to NMC's failure to pay for release by the agreed date of 30 April, 1999.

Toward the total release of 3,764.900 mt, NMC has paid U.S. $800,000, still outstanding U.S. $41,952.11.

*Defendant's Exhibit* N.

On June 4, 1999, Glencore faxed the following letter to Seaboard and NMC:

Pleased be advised that Monday June 6th is the date that the Seaboard guarantee issued to Glencore [by Bresky] on May 7th 1999 expires.... Please be further advised that the original agreement regarding the release of the 8,280.715 Mt's of white maize was that Glencore would be paid within 14 days from the first day of release i.e. latest April 30th 1999. It is now one month later and NMC have only paid for 3,500 Mt's hence you will appreciate our concern over receiving the outstanding payment.

*Defendant's Exhibit* P (paragraph spacing omitted). Two weeks later, on June 28, 1999, Glencore faxed the following letter to Seaboard and NMC:

We ... thought we would take this opportunity to refocus on the issues at hand.

A. Corporate Guarantee. The last guarantee sent by Seaboard Corp. [Bresky's letter of May 7, 1999] has

8. Concerning the 3,764.900 metric tons which NMC uplifted between April 16 and April 30, 1999, the record does not disclose the number of metric tons for which NMC had paid. The parties nonetheless agree that NMC paid the balance due of $41,952.11. Consequently, NMC paid for all of the grain which it uplifted between April 16 and April 30, 1999 under the JVA. It did not pay for the 4,515.815 metric tons which Glencore released on April 16 and April 19, 1999, but which it did not uplift at that time.

9. As noted, Glencore released 1,000 metric tons on April 16 and 7,280.715 metric tons on April 19. The record does not state out of which releases NMC uplifted 3,764.900 metric tons. Although the record is not clear, it appears that both instructions remained in effect at the time Glencore issued the new release on May 7. Gooding prepared the amended release instruction of May 7, 1999. She does not recall whether she was aware of Bresky's "soft comfort" letter of May 7 at the time she prepared it. *See Gooding Depo.* at 51:1–14.

now expired. We would appreciate it if you could have the guarantee reissued with the validity being the conclusion of all outstanding contracts with NMC rather than a fixed point in time. * * *

*Defendant's Exhibit Q.*

After May of 1999, NMC continued to uplift and pay for small amounts of grain, but the record does not disclose details regarding these uplifts. Glencore issued release instructions to the order of NMC, without reference to Seaboard. NMC paid for these small uplifts, but they did not deplete the grain stored under the JVA.

In August 1999, NMC agreed to let Glencore sell some of the maize under the JVA for $180 per metric ton and assign the price shortfall to NMC. The record does not reflect how much maize Glencore sold or the amount of maize which remained under the JVA at that time.

On March 3, 2000, Glencore declared that NMC was in breach of its obligations under the JVA, advised NMC that it would be in default if it did not pay the entire balance by March 8, 2000, and further stated that it would begin selling the maize to mitigate its losses. That same day, Glencore demanded that Seaboard pay the amounts due under its guaranty of April 16, 1999. Neither NMC nor Seaboard paid the debt, and between April and September of 2000, Glencore sold the remaining maize to third parties. Glencore conducted the sales in a commercially reasonable manner and obtained the best prices available.

Glencore and NMC proceeded to arbitration regarding NMC's failure to uplift the entire balance of maize under the JVA.[10] An arbitrator found that Glencore had suffered (1) a loss of $594,390.06 on its sales to third parties and (2) damage to the grain in the amount of $128,151.13.[11] The arbitrator awarded damages to Glencore in the amount of $722,541.19 plus interest from March 17, 2000. Neither NMC nor Seaboard has reimbursed Glencore for its loss, but Seaboard does not dispute that NMC is liable for the arbitration award.

In 2000, NMC ceased trading and initiated liquidation proceedings in Zambia. National Milling Corporation, which is owned by Seaboard, purchased the NMC assets and resumed its business.

## III. Analysis

Glencore asserts that Seaboard is liable under guaranties created by (1) Dannov's letter of April 16, 1999; (2) Graver's letter of April 16, 1999; and (3) Bresky's letter of May 7, 1999. Glencore also claims that Seaboard is liable under the theory of promissory estoppel. Seaboard responds that the Graver and Bresky letters are not valid guaranties.[12] Seaboard agrees that

10. Glencore and NMC had agreed to arbitrate any disputes which arose under the JVA. Glencore provided notice of its intent to arbitrate on October 18, 1999. The record does not disclose the date of the arbitration proceedings or the arbitrator's award. Although the record is not clear, the arbitration apparently addressed NMC's liability under the JVA. It appears that Seaboard was not a party to the arbitration and that the arbitration did not address Seaboard's liability under the Dannov guaranty.

11. Glencore believes that the maize deteriorated in quality due to prolonged storage and "other factors that may include insect damage and water damage." Glencore's answer to interrogatory no. 7 (*Defendant's Exhibit* B at 5).

12. Glencore argues that the pretrial order does not preserve this argument, see *Plaintiffs' Reply* at 13 n.5, but the pretrial order clearly states Seaboard's position that the letters do not create legally binding guaranties. See *Pretrial Order* (Doc. # 51) filed November 5, 2002 at 5–6.

Dannov's letter of April 16, 1999 constitutes a guaranty but argues that it is unenforceable because Glencore released the wrong amount of grain under that guaranty and enforcement is barred by various affirmative defenses, *i.e.* (1) modification, amendment and/or substitution, (2) accord and satisfaction, (3) estoppel, (4) waiver and (5) laches. *See Pretrial Order* at 9–19.

Glencore seeks summary judgment on Seaboard's liability under all three letters, and argues that as a matter of law Seaboard cannot establish any affirmative defenses to liability. Seaboard seeks summary judgment on Glencore's promissory estoppel claim and a declaration that as a matter of law Graver's letter of April 16, 1999 and Bresky's letter of May 7, 1999 are not valid guaranties.[13] In addition, Seaboard seeks summary judgment on its affirmative defenses of (1) modification, amendment and/or substitution and (2) accord and satisfaction.

**A. Graver's Letter Of April 16, 1999 And Bresky's Letter Of May 7, 1999**

█ As noted, the parties have filed cross-motions for summary judgment on the question whether Graver's letter of April 16, 1999 and Bresky's letter of May 7, 1999 guaranteed NMC's liability to Glencore.[14] Graver's letter of April 16 stated:

Regarding commodity purchases from [sic][NMC] from Glencore, Seaboard Corporation as 100% owner of NMC are fully aware of NMC's transactions with Glencore and support them in their performance with these transactions. Thank you for your attention to our needs and requirements at NMC.

*Plaintiffs' Exhibit* 20 (paragraph spacing omitted). Bresky's letter of May 7 stated:

.... Seaboard Corporation, through wholly-owned subsidiaries, owns 100 percent of NMC and is fully aware of NMC's transactions with Glencore and will support NMC in the performances with these transactions. This letter shall remain in full force and effect for 30 days from the date hereof.

*Defendant's Exhibit* K (paragraph spacing omitted).

█ Kansas law will not hold a guarantor liable unless an intention to bind itself is "clearly manifested." *John S. Britain Dry–Goods Co. v. Yearout,* 59 Kan. 684, 684, 54 P. 1062, 1062 (1898). A guaranty must be in writing, signed by the party to be charged and state with certainty (1) each party to the contract; (2) the subject matter to which the contract relates; and (3) the terms and conditions of all the promises constituting the contract and by whom and to whom the promises are made. *Walton v. Piqua State Bank,* 204 Kan. 741, 747, 466 P.2d 316, 322 (1970). The entire contract must be explained in

---

13. Glencore complains that Seaboard's cross motion for summary judgment on the Graver and Bresky letters is out of time. Seaboard made its motion in response to plaintiffs' motion for summary judgment. *See Defendant's Memorandum In Opposition To Plaintiffs' Motion For Summary Judgment And Cross Motion For Summary Judgment On The Graver And Bresky Letters ("Defendant's Response")* (Doc. # 43) filed October 28, 2002. The motion does not require additional fact findings,

however, and interests of judicial economy favor a ruling at this time.

14. Glencore does not explain why it seeks to collect under the Graver and Bresky letters. It appears that plaintiff asserts the claims (1) as alternatives to the Dannov guaranty and/or (2) to recover for the 280.715 metric tons which are not covered by the Dannov guaranty.

writing—it cannot rest partly in writing and partly in parol evidence. *Id.*

The language in the Graver and Bresky letters is similar. Both letters state that Seaboard (1) owns 100 per cent of NMC; (2) is fully aware of NMC's transactions with Glencore; and (3) will "support" NMC in its performance of the transactions. Bresky's letter adds that it will "remain in full force and effect for 30 days." A fair reading does not indicate that by these letters Seaboard "clearly manifested" an intention to bind itself to the debts of NMC. *Yearout,* 59 Kan. at 684, 54 P. at 1062. The word "support" can mean many things, *e.g.,* actively promoting the interests of NMC, corroborating, endorsing or advocating NMC's performance, or providing manpower or financial support to NMC, among other things. *See Webster's Third New Int'l Dictionary* at 2297 (1986). All of these definitions suggest that Seaboard will maintain or reinforce NMC in its performance under the JVA—not that Seaboard will step in and assume NMC's obligations under the JVA or take any other action in direct relation to Glencore. Moreover, the letters do not identify specific transactions or amounts of liability for which Seaboard has allegedly accepted responsibility. *See Walton,* 204 Kan. at 748, 466 P.2d at 323. In sum, the letters do not strongly and clearly indicate any intent that Seaboard assume liability. *See Yearout,* 59 Kan. at 684, 54 P. at 1062 ("While a guarantor should be held to every obligation fairly embraced within the terms of the instrument . . .

the language should be strong and clear to justify the court in holding it to be [a continuing guaranty] without limit either as to time or amount.") Accordingly, Seaboard is entitled to summary judgment on Glencore's claim that it is liable for breach of guaranty under the Graver and Bresky letters. Glencore's motion for summary judgment on this issue is overruled.

**B. Dannov's Letter Of April 16, 1999**

█ As noted, Dannov's letter stated:

In the event that NMC do[es] not make payment within 14 days of the release issued 16th April 1999 for 8,000 mt of white maze supplied under the Glencore, NMC Joint Venture Agreement, Seaboard Corporation will accept liability for the payment to Glencore for the said 8,000 mt of maize or whatever lesser remaining unpaid.

*Plaintiffs' Exhibit* 21. Seaboard agrees that Dannov's letter of April 16, 1999 constitutes a guaranty. Glencore claims that as a matter of law Seaboard is liable under that guaranty. Seaboard insists that the guaranty is not enforceable because Glencore released either too much or too little grain in April of 1999. Specifically, Seaboard complains that Glencore (1) did not release the full 8,000 metric tons on April 16, 1999 and (2) released 8,280.715 metric tons (instead of 8,000 metric tons) on April 16 and April 19, 1999.[15] Seaboard also seeks summary judgment on its affirmative defenses of (1) modification, amendment and/or substitution; and (2) accord and satisfaction.[16]

---

**15.** Seaboard raises these arguments in an effort to defeat Glencore's motion for summary judgment but it does not identify them as affirmative defenses and the pretrial order does not identify them as such. *See Pretrial Order* at 9–19. Glencore, however, does not argue that Seaboard has waived these issues.

**16.** Seaboard presents "parol evidence" in case the Court finds that Dannov's letter of April 16, 1999 is ambiguous. *Defendant's Response* at 19. Specifically, Seaboard argues that Glencore's actions after April 16, 1999 demonstrate that the parties intended for the Dannov guaranty to cover only the obligations which arose "out of the release instruction

### 1. Whether The Guaranty Is Unenforceable Because Glencore Did Not Release 8,000 Metric Tons On April 16, 1999

Seaboard argues that Glencore is not entitled to summary judgment because it did not comply with the guaranty by releasing 8,000 metric tons on April 16, 1999. Seaboard asserts that Dannov's letter specifically refers to a release of 8,000 metric tons on April 16, 1999; that Glencore released only 1,000 metric tons on that date; and that therefore, as a matter of law, Seaboard cannot be liable on the guaranty.

This argument is frivolous. First, Dannov's letter stated that if NMC did not pay for 8,000 metric tons "within 14 days of the release issued 16th April 1999," *i.e.* by April 30, Seaboard would accept liability. It did not require Glencore to release 8,000 metric tons on April 16. Second, while a guarantor is not liable if its undertaking is materially changed without its consent, *see Kutilek v. Union Nat'l Bank of Wichita,* 213 Kan. 407, 412, 516 P.2d 979, 983 (1973), the record contains no suggestion that Glencore's decision to release only 1,000 metric tons on April 16, and the balance on April 19, was in any respect material to the guaranty. *See Peoples Nat'l Bank, Clay Center, Kan. v. Purina Mills, Inc.,* 931 F.Supp. 1525, 1531 (D.Kan.1996) (material alteration without guarantor's consent will discharge guarantor; whether material alteration has occurred depends on whether guaranty still expresses same contract, operates same way and has same effect) (applying Missouri law). In short, Seaboard has not shown that Glencore's decision to issue separate releases on April 16 and April 19 materially altered the underlying obligation in any way. *See id.* Seaboard's evidence on this point does not raise a genuine issue of material fact with regard to the enforceability of the guaranty.

### 2. Whether The Guaranty Is Unenforceable Because Glencore Released 8,280.715 Metric Tons Instead Of 8,000 Metric Tons

Seaboard also complains that Glencore released too much (rather than too little) maize. Specifically, Seaboard argues that Glencore released 8,280.715 metric tons on April 16 and 19, 1999, rather than 8,000 metric tons, as called for by the guaranty, and because Glencore thereby attempted to expand Seaboard's liability under the guaranty, it may not recover thereunder. *See Defendant's Response* at 21.

The Court must strictly construe a guaranty and not extend a guarantor's obligation beyond the precise terms of the guaranty. *See Overland Park Sav. & Loan Ass'n v. Miller,* 243 Kan. 730, 738, 763 P.2d 1092, 1098 (1988); *Yearout,* 59

that was supposed to be issued on April 16, as opposed to NMC's obligations under the entire JVA." *Id.* at 17. Although Seaboard does not clearly articulate its argument, it appears to argue that the parties intended the Dannov guaranty to cover only the amount of grain which NMC uplifted for the FRA deal, as opposed to the 8,000 metric tons which the guaranty specifies.

Seaboard does not explain in what way the Dannov guaranty is ambiguous and it makes no such assertion in the pretrial order. *See Pretrial Order* (Doc. # 51). The "parol evidence" which Seaboard presents involves events which occurred after Seaboard issued the Dannov guaranty. *See Defendant's Response* at 17–19 (on May 7, 1999 Glencore amended invoice and release instructions and resumed prepayment requirement; after April 30, 1999 Glencore authorized releases to order of NMC without reference to Seaboard; on June 3, 1999 Glencore demanded payment for 3,764.900 metric tons). The Court considers this evidence with respect to Seaboard's arguments regarding its affirmative defenses, but not as an independent argument that the Dannov guaranty is ambiguous.

Kan. at 684, 54 P. at 1062. Consequently, the Court may hold Seaboard liable for only 8,000 metric tons. Nothing in the record suggests that Glencore was trying to expand Seaboard's liability by releasing 8,280.715 metric tons on April 16 and 19, 1999. If Glencore had that intent, it was unavailing. In either case, Seaboard is not relieved of its obligations under the guaranty. *Cf. George E. Failing Co. v. Cardwell Inv. Co.*, 190 Kan. 509, 517, 376 P.2d 892, 898 (1962) (guaranty was void as to certain invoice but not void in its entirety). Seaboard's argument does not raise a genuine issue of material fact with regard to the enforceability of the Dannov guaranty.

### 3. Modification, Amendment And/Or Substitution

As affirmative defenses, Seaboard asserts that it is not liable on the Dannov guaranty because on May 7, 1999 Glencore modified NMC's underlying obligation by (1) issuing an amended invoice and release instruction and (2) resuming its prepayment requirement for any grain which NMC uplifted. Seaboard also asserts that Bresky's letter of May 7, 1999 replaced the Dannov guaranty, in that Glencore agreed to absolve Seaboard's liability under the Dannov guaranty in exchange for Seaboard's promise to provide Glencore the soft comfort of support for continued grain sales. *See Defendant's Response* at 23. Glencore seeks summary judgment on all three defenses. Seaboard seeks summary judgment on first two but argues that fact questions preclude summary judgment on the question whether Bresky's letter of May 7 replaced or amended the Dannov guaranty.

As noted, on April 16, 1999, Glencore issued an invoice for $1,851,816.29 for 8,280.715 metric tons of maize—all of the maize which remained under the JVA. On May 7, 1999, Glencore issued an amended invoice for 3,764.900 metric tons—the amount which NMC had actually uplifted between April 16 and April 30, 1999. In addition, Glencore issued an amended release which lowered from 8,280.715 to 1,000 metric tons the amount of grain which NMC could uplift without further release instructions and prepayment. Seaboard asserts that these actions extinguished NMC's obligation to uplift and pay for the remaining 4,515.815 metric tons which Glencore had released on April 16 and April 19, 1999.

Seaboard cites one case in support of its position: *Iola State Bank v. Biggs*, 233 Kan. 450, 662 P.2d 563 (1983). In *Iola State Bank*, the Kansas Supreme Court stated that "a guarantor may be relieved of an obligation to pay if the debt is extinguished, if there is a valid release or discharge ... or if there is a change in the original contract between the obligor and obligee." *Id.* at 456, 662 P.2d at 570. The Court does not quarrel with this authority but finds no record support for the factual predicate—that Glencore extinguished, released and/or modified the underlying obligation. *See Memorandum In Support Of Defendant's Motion For Summary Judgment ("Defendant's Memorandum")* (Doc. # 37) filed October 11, 2002 at 10–12; *Defendant's Response* at 16–17. The facts of *Iola State Bank* are distinguishable. In that case, defendant guaranteed the indebtedness of two individuals. After the defendant issued the guaranties, the individuals incorporated their business and consolidated their individual notes into one note in the name of the corporation. Defendant then issued a new guaranty, for the corporate debt. The Kansas Supreme Court held that the corporate note extinguished the individual notes, and that the guarantor was no longer liable on the individual guaranties. *See Iola State Bank*, 233 Kan. at 456–57, 662 P.2d at 570. Nothing in *Iola State Bank* supports Seaboard's

conclusion that Glencore's amended invoice and release instruction extinguished or modified the underlying obligation which Seaboard guaranteed.

Seaboard also asserts that Glencore materially modified NMC's underlying obligation when it resumed its prepayment requirement, in that Glencore undermined the "entire purpose" of Seaboard's guaranty. *Defendant's Memorandum* at 14. The facts of this case do not support such a conclusion. The JVA required prepayment. On the FRA deal, in exchange for the Seaboard guaranty and NMC's promise to make payment by April 30, Glencore released 8,280.715 metric tons without prepayment. Glencore did not resume the prepayment requirement until May 7, 1999, after NMC had breached the JVA and, in particular, its promise to pay for the FRA grain by April 30. Seaboard has not shown how Glencore's refusal to waive its right to require prepayment after May 7 materially altered NMC's obligations under the JVA or Seaboard's position relative to the indebtedness which it guaranteed. If anything, Glencore's decision to again require prepayment limited—rather than expanded—Seaboard's exposure under the Dannov guaranty. Glencore is entitled to summary judgment on this affirmative defense.

 Finally, Seaboard claims that Bresky's letter of May 7, 1999 replaced the Dannov guaranty, in that Glencore agreed to relieve Seaboard from liability under the Dannov guaranty in exchange for "the soft comfort of support of NMC's obligations and an agreement that NMC would continue to buy Glencore grain." *Defendant's Response* at 23.[17] While Glencore seeks summary judgment on this issue, Seaboard maintains that the record

reveals a genuine issue of material fact on its defense. *See Defendant's Response* at 22–23.

As noted, Dannov's letter of April 16, 1999 states:

> In the event that NMC do[es] not make payment within 14 days of the release issued 16th April 1999 for 8,000 mt of white maze supplied under the Glencore, NMC Joint Venture Agreement, Seaboard Corporation will accept liability for the payment to Glencore for the said 8,000 mt of maize or whatever lesser remaining unpaid.

*Plaintiffs' Exhibit* 21. On May 7, 1999, Bresky wrote:

> .... Seaboard Corporation, through wholly-owned subsidiaries, owns 100 percent of NMC and is fully aware of NMC's transactions with Glencore and will support NMC in the performances with these transactions. This letter shall remain in full force and effect for 30 days from the date hereof.

*Defendant's Exhibit* K (paragraph spacing omitted).

Under Kansas law, the substitution of a new obligation for an existing debt or obligation, which is thereby extinguished, is called a novation. *See Baxter State Bank v. Bernhardt*, 985 F.Supp. 1259, 1267 (D.Kan.1997). "A novation is never presumed, and the burden is on the party asserting it to establish the essential requirements." *Davenport v. Dickson*, 211 Kan. 306, 310, 507 P.2d 301, 306 (1973). Unless there is a "clear and definite intention" by all parties to extinguish the old obligation, a novation does not exist. *Id.*

Seaboard asserts that a reasonable jury could conclude that Bresky's letter of May

---

**17.** Seaboard does not explain why Glencore would give up its rights under the Dannov guaranty for 30 days of "soft comfort" or assurance that NMC would continue to buy grain which it was already required to purchase.

7 "absolved Seaboard of further responsibility under the April 16 guaranty based on the 'soft comfort' of support of NMC's obligations and an agreement that NMC would continue to buy Glencore grain." *Defendant's Response* at 23. Seaboard, however, cites no evidence of a "clear and definite intention" by the parties to extinguish its liability under the guaranty of April 16. *Davenport,* 211 Kan. at 310, 507 P.2d at 306. Glencore is entitled to summary judgment on this affirmative defense.

### 4. Accord And Satisfaction

■ Seaboard maintains that Glencore accepted payment for 3,764.900 metric tons in full satisfaction of the underlying obligation which Seaboard guaranteed, *i.e.* NMC's promise to pay for 8,000 metric tons by April 30, 1999. To establish accord and satisfaction, Seaboard must show "an offer in full satisfaction of an obligation, accompanied by such acts and declarations or made under such circumstances that [Glencore] is bound to understand that if [it] accepts the offer, it is in full satisfaction of and discharges the original obligation." *E F Hutton & Co. v. Heim,* 236 Kan. 603, 610, 694 P.2d 445, 451 (1985).

■ Seaboard's only evidence of this defense is that on May 7, 1999 Glencore issued an amended invoice for 3,764.900 metric tons which NMC paid. Seaboard presents no evidence that NMC offered to pay the amended invoice in full satisfaction of its obligation to pay for 8,000 metric tons by April 30, or that Glencore agreed to accept payment of the amended invoice in full satisfaction of that obligation. *See FDIC v. Addleman,* 242 Kan. 728, 731, 750 P.2d 1037, 1039 (1988). Glencore is enti-

tled to summary judgment on this affirmative defense.

### 5. Estoppel, Waiver And Laches

Glencore seeks summary judgment on Seaboard's affirmative defenses of estoppel, waiver and laches. Seaboard does not respond to this portion of Glencore's motion. For the reasons stated in *Plaintiffs' Memorandum* at 33–37, Glencore is entitled to summary judgment on Seaboard's affirmative defenses of estoppel, waiver and laches.

### C. Promissory Estoppel

Seaboard asserts that it is entitled to summary judgment on Glencore's claim of promissory estoppel. Specifically, Seaboard maintains that Glencore cannot show that it suffered harm as a result of Seaboard's promise in the guaranty of April 16.[18] In order to prove promissory estoppel, Glencore must show that (1) Seaboard reasonably expected Glencore to act on its promise; (2) Glencore acted reasonably in relying on the promise; and (3) a refusal to enforce the promise would sanction the perpetration of fraud or result in other injustice. *See Templeton v. Kan. Parole Bd.,* 27 Kan.App.2d 471, 6 P.3d 910, 913 (2000).

Seaboard argues that Glencore cannot show damages because NMC paid for the 3,764.90 metric tons which it uplifted between April 16 and April 30, 1999. This argument misses the mark. By April, NMC had breached is promise to uplift by March 31 the 17,100 metric tons which remained under the JVA. In consideration for the Dannov guaranty and NMC's promise to pay for 8,000 metric tons by April 30, 1999, Glencore nonetheless released 8,280.715 metric tons without re-

---

18. Seaboard's motion ignores the fact that plaintiffs' promissory estoppel claim is not limited to Dannov's letter of April 16. Glen-

core maintains that Seaboard made repeated promises, orally and in writing, that it would satisfy NMC's obligations.

quiring prepayment. NMC uplifted and paid for only 3,764.900 metric tons, leaving 4,235.100 metric tons in storage. Under the JVA, Glencore was damaged by NMC's failure to accept delivery and pay for those 4,235.100 metric tons. Seaboard has not shown that it is entitled to summary judgment on Glencore's claim of promissory estoppel.

## IV. Conclusion

Glencore is entitled to summary judgment with respect to liability on its claim for breach of the guaranty stated in Dannov's letter of April 16, 1999. The amount of liability, however, remains an issue in the case.[19] Glencore is also entitled to summary judgment on Seaboard's affirmative defenses. Seaboard is entitled to summary judgment on Glencore's claims for breach of guaranties stated in Graver's letter dated April 16, 1999 and Bresky's letter dated May 7, 1999.

**IT IS THEREFORE ORDERED** that *Plaintiffs' Motion For Summary Judgment* (Doc. # 33) filed October 11, 2002 be and hereby is **SUSTAINED.** Glencore is entitled to summary judgment on its claim that Seaboard is liable for breach of guaranty based on Dannov's letter of April 16, 1999. The amount of Seaboard's liability remains an issue in the case.

**IT IS FURTHER ORDERED** that *Defendant Seaboard Corporation's Motion For Summary Judgment* (Doc. # 36) filed October 11, 2002 be and hereby is **OVERRULED.**

**IT IS FURTHER ORDERED** that defendant's *Memorandum In Opposition To Plaintiffs' Motion For Summary Judgment And Cross Motion For Summary Judgment On the Graver And Bresky Letters* (Doc. # 43) filed October 28, 2002 be and hereby is **SUSTAINED.** Seaboard is entitled to summary judgment on plaintiffs' claim that it is liable for breach of guaranty as a result of Graver's letter of April 16, 1999 and Bresky's letter of May 7, 1999.

The sole issues which remain for trial are (1) Glencore's claim for promissory estoppel; and (2) the amount of damages which Glencore is entitled to recover under the Dannov guaranty dated April 16, 1999.

---

**19.** Glencore asserts that Seaboard is liable for the amount of the arbitration award—$722,541.19 plus interest from March 17, 2000. The arbitrator, however, determined the amount of Glencore's damages which resulted from NMC's failure to purchase 8,280.715 metric tons under the JVA. Seaboard's guaranty applies only to NMC's failure to pay for 8,000 metric tons by April 30, 1999. Glencore asserts that Seaboard is liable for the full amount of the arbitration

award because it was entitled to first apply NMC payments to the 280.715 metric tons which were not subject to the guaranty. *See Plaintiffs' Memorandum In Response To Defendant's Motion For Summary Judgment* (Doc. # 41) filed October 28, 2002 at 11 n.6 (citing *Baxter State Bank v. Bernhardt*, 985 F.Supp. 1259, 1268–69 (D.Kan.1997)). Glencore may be correct but the summary judgment record does not establish how Glencore applied the payments which it received.